# IN THE SUPREME COURT OF IOWA

No. 15–1815

Filed April 20, 2018

**MARTIN SHANE MOON,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Clarke County, Gary G. Kimes, Judge.

An applicant asks for further review of a court of appeals decision dismissing his postconviction-relief action. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Christine E. Branstad of Branstad Law, P.L.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Thomas E. Bakke, Assistant Attorney General, and Michelle M. Rivera, County Attorney, for appellee.

**WIGGINS, Justice.**

An applicant filed a postconviction-relief action alleging the State committed a *Brady*[1] violation by withholding potentially exculpatory information regarding the statements made by a witness who ultimately did not testify at the applicant's criminal trial. The applicant further alleged this information constituted newly discovered evidence. The district court declined to reach the merits of the applicant's substantive claims. Rather, the court applied the newly-discovered-evidence test, instead of the new-ground-of-fact test, to hold that the three-year statute of limitations barred all claims.

The applicant appealed, and we transferred the case to our court of appeals. The court of appeals affirmed, holding the applicant failed to establish a nexus between the new ground of fact and the applicant's conviction. The applicant applied for further review, which we granted.

On further review, we hold the statute of limitations does not bar the applicant's substantive claims. However, the applicant fails to establish a *Brady* violation and fails to demonstrate a viable newly-discovered-evidence claim. Accordingly, we vacate the decision of the court of appeals and affirm the judgment of the district court summarily dismissing the applicant's postconviction-relief application.

## I. Background Facts and Proceedings.

In August 1990, Kevin Dickson was shot and killed. Nine years later, the State charged Martin Moon and Casey Brodsack with first-degree murder. Brodsack pled guilty to second-degree murder in exchange for testifying truthfully at Moon's trial.

---

[1]*See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

Brodsack testified he, Moon, and Dickson roomed together on the second floor of a house in Winterset while their neighbor, Scott Aukes, lived with his roommate on the first floor. Brodsack testified he, Moon, Dickson, and Aukes went to an abandoned farmhouse to look for marijuana left by Moon's drug dealer. While Brodsack was checking for drugs behind the water heater in the basement, he heard six or seven gunshots. Brodsack went around and saw Dickson lying on the ground, with Moon holding a gun in his hand. Aukes was not present in the basement during this episode. Moon handed Brodsack the gun. With another gun, Moon forced Brodsack at gunpoint to shoot Dickson because Moon allegedly did not want to be the only one involved. Brodsack shot Dickson three times.

Brodsack further testified he, Moon, and Aukes went back to Winterset to retrieve a sledgehammer. They then returned to the farmhouse and tried to knock in one of the basement walls to cover up Dickson's body. When that plan failed, they dragged Dickson's body outside and discarded it into a cistern.

According to Brodsack, sometime in 1996, he and his coworker Brett Lovely were painting fire hydrants near the farmhouse. Brodsack apparently told Lovely about the murder and showed him what was left of Dickson—just bones—in the cistern. Lovely kept the secret for a few years but eventually told law enforcement about it in 1999.

Before trial, the State included a man by the name of Brandon Lee Boone as a witness in the minutes of testimony. The State anticipated Boone to testify that law enforcement had conducted an interview of him on or about May 8, 1999. Boone would also testify he and Moon were inmates incarcerated at the same prison in 1995 or 1996. During this time, while Boone and Moon were walking together in the yard, Moon

allegedly stated he and Brodsack killed Dickson and threw the body into a cistern.

Moon moved to exclude Boone from testifying at trial for a number of reasons: the State advised Moon that Boone was unwilling to cooperate, and Moon did not have an opportunity to depose Boone or investigate Boone's May 1999 interview. Moon also alleged the admission of any statements made by Boone to law enforcement was hearsay and a violation of his Sixth Amendment confrontation rights.

In response to Moon's motion, the State alleged it had provided to Moon the Iowa Division of Criminal Investigation (DCI) report containing the interview. Moreover, the State informed Moon that Boone had refused to cooperate since his arrest as a material witness, and the State did not know whether Boone would cooperate at trial. Although the record is unclear as to the district court's ruling on the motion to exclude, Boone ultimately did not testify at trial.

In June 2000, the jury found Moon guilty as charged, and the district court sentenced him to a mandatory life term in prison. The court of appeals affirmed Moon's conviction. Following that appeal, the clerk issued procedendo in July 2002.

On October 31, Moon filed his first pro se application for postconviction relief. On August 19, 2004, Moon's appointed postconviction counsel filed an amended application alleging ineffective assistance of counsel and trial court error. The district court denied the application, and the court of appeals affirmed.

On January 12, 2012, Moon filed his second pro se postconviction-relief application, almost a decade after the issuance of procedendo. Moon made two allegations. First, pursuant to Iowa Code sections

822.2(1)(*a*) (2011),[2] he claimed the sentence and judgment violated the Due Process Clauses of the United States and Iowa Constitutions. Second, pursuant to section 822.2(1)(*g*), he claimed the sentence and judgment were subject to collateral attack because the trial information was insufficient and unconstitutional.

Moon attached affidavits to this application. Of importance are Boone's and Moon's affidavits. In his January 4, 2011 affidavit, Moon claimed he had never seen any police reports or investigative notes concerning Boone's alleged false statements to law enforcement.

In his April 7, 2011 affidavit, Boone declared he had given several false statements to law enforcement at the behest of Brodsack. He attested law enforcement contacted him multiple times between the years 1998 and 1999 regarding Dickson's murder. Boone declared Brodsack had prepared him to give false statements implicating Moon in the death of Dickson. Moreover, Boone gave the false statements because he was under the impression he would receive leniency from the State on the pending charges against him if he provided information implicating Moon in Dickson's murder.

Boone further declared, "I tried in each of those statements, *even back then*, to convey to authorities that they were *in fact* false" but law enforcement "intentionally ignored my attempts." Boone attested, "*[T]hese indications of falsehood can be found in* each of my original written and initialed statements taken by state law authorities from late 1998 to May of 1999." Furthermore, Boone stated, "[The] Minutes of Testimony . . . *does not contain* the exact words or statements that I gave to law enforcement authorities." In sum, Boone stated, "I had no

---

[2]Moon explicitly cited section 822.2(1) and (4). However, upon our examination of the statute, we believe Moon meant to cite to section 822.2(1)(*a*).

information of [Moon's] involvement in [Dickson's murder] *other than what Casey told me to say* whenever any law enforcement authorities approached me asking questions."

On October 22, 2012, Moon submitted a supplemental petition of pro se issues, claims, and grounds for relief. On March 16, 2015, Moon filed a motion to amend his application. The amended application alleged pursuant to Iowa Code section 822.2(1)(*d*) (2015), newly discovered evidence requires vacation of his original sentence and judgment.[3] Specifically, this newly discovered evidence is the contents of Boone's 2011 affidavit. Additionally, Moon alleged the State's suppression of exculpatory evidence, such as police reports, recordings, and interviews concerning Boone, amounts to a *Brady* violation.

The State moved for summary dismissal of Moon's second postconviction-relief application pursuant to section 822.6. The State argued the application was untimely under the three-year statute of limitations set out in section 822.3 because the clerk issued procedendo in July 2002, and Moon filed the instant application in January 2012. The State therefore claimed the district court lacked jurisdiction to hear the case because the statute of limitations had run. The State also argued Moon's claims in his application and supplemental petition were meritless.

Moon resisted the State's motion, arguing the limitations period did not apply to his claims because a new ground of fact exists. Moon then applied the newly-discovered-evidence test to his substantive claim based on section 822.2(1)(*d*). He also argued he provided sufficient

---

[3]Moon cited to section 822.2(4) but we believe he meant to cite to section 822.2(1)(*d*). Moon correctly cited to 822.2(1)(*d*) in his resistance to the State's motion for summary dismissal.

evidence to create factual questions regarding his due process claim based on a *Brady* violation.

On October 16, the district court granted the State's motion for summary dismissal, concluding Moon's application was untimely by applying the newly-discovered-evidence test rather than the ground-of-fact test. The court reasoned the evidence was not material but merely impeaching. The court did not address the alleged *Brady* violation.

Moon appealed. The court of appeals affirmed the summary dismissal, concluding the ground-of-fact exception did not apply. Moon filed an application for further review, which we granted. We lay out additional facts as necessary.

## II. Issues.

The threshold issue is whether the three-year statute of limitations bars Moon's claims. The substantive issues are whether the State suppressed *Brady* material by withholding potentially exculpatory information regarding Boone's statements to law enforcement and whether this information constitutes newly discovered evidence.

## III. Scope of Review.

We generally review postconviction proceedings, including summary dismissals of postconviction-relief applications, for errors at law. *Castro v. State*, 795 N.W.2d 789, 792 (Iowa 2011). When the basis for relief implicates a violation of a constitutional dimension, our review is de novo. *Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010); *Bugley v. State,* 596 N.W.2d 893, 895 (Iowa 1999), *superseded by statute on other grounds*, 2004 Iowa Acts ch. 1017, § 2 (codified at Iowa Code § 814.7 (2005)), *as recognized in State v. Johnson*, 784 N.W.2d 192, 197 (Iowa 2010).

However, the district court summarily disposed of this case under section 822.6.  We apply our summary judgment standards to summary disposition of postconviction-relief applications.  *Schmidt v. State*, ___ N.W.2d ___, ___ (Iowa 2018); *Manning v. State*, 654 N.W.2d 555, 559–60 (Iowa 2002).  Therefore, on further review we will apply our summary judgment/disposition standards.  Summary disposition is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 1.981(3).  The moving party bears the burden of showing the absence of a genuine issue of material facts.  *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 73 (Iowa 2011).  We view the record in the light most favorable to the nonmoving party.  *Eggiman v. Self-Insured Servs. Co.*, 718 N.W.2d 754, 758 (Iowa 2006).  We draw all legitimate inferences from the record in favor of the nonmoving party.  *Vossoughi v. Polaschek*, 859 N.W.2d 643, 649 (Iowa 2015).

Additionally, we also apply summary judgment standards to the statute-of-limitations issue.  *See Vossoughi*, 859 N.W.2d at 649–55 (applying summary judgment standards to resolve the statute-of-limitations issue).

### IV.  Statute of Limitations.

Our postconviction-relief statute contains a statute of limitations for filing postconviction-relief applications.  Iowa Code § 822.3.  The Code provides in relevant part that such applications "must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued."  *Id.*  Moon relies on an exception to this rule.  The Code provides that "this

limitation does not apply to a ground of fact or law that could not have been raised within the applicable time period." *Id.*

We examine an instructive case on applying the statute of limitations under section 822.3. In *Harrington v. State,* the defendant filed his second postconviction-relief application more than two decades after his conviction. 659 N.W.2d 509, 515 (Iowa 2003). We first stated the applicant must meet the "obvious requirement" that he or she could not have raised the ground of fact within the limitations period. *Id.* at 520. The onus is on the applicant to make this showing. Additionally, we stated "the applicant must . . . show a *nexus* between the asserted ground of fact and the challenged conviction." *Id.* (emphasis added). Thus, the "applicant relying on the ground-of-fact exception must show the ground of fact is *relevant* to the challenged conviction." *Id.* at 521 (emphasis added). We defined "relevant" as follows: "the ground of fact must be of the type that has the *potential* to qualify as material evidence for purposes of a substantive claim under section 822.2." *Id.* (emphasis added).

We explicitly and "specifically reject[ed] any requirement that an applicant must show the ground of fact would likely or probably have changed the outcome of the underlying criminal case in order to avoid a limitations defense." *Id.* The basic reasoning behind our rejection was that "[a] determination of that issue must await an adjudication, whether in a summary proceeding or after trial, on the applicant's substantive claim for relief." *Id.* After articulating the standard for the ground-of-fact exception, we stated the district court rejected the defendant's assertion of this exception because it erroneously believed the defendant had to prove the ground of fact met the elements of a newly-discovered-evidence claim. *Id.*

The district court in the instant case reached its holding through a merits analysis of a newly-discovered-evidence claim rather than applying the ground-of-fact standard we clarified in *Harrington.* We again emphasize the ground-of-fact exception pursuant to section 822.3 is not the same as a substantive claim for postconviction relief based on newly discovered evidence pursuant to section 822.2(1)(*d*). *See id.* at 520–21.

We now apply the ground-of-fact test to determine whether Moon's claims are time barred. First, a genuine issue of material fact exists as to whether Moon could have known about the contents of the affidavit before the end of the limitations period. In his January 2011 affidavit, Moon declared he had never seen any police reports or investigative notes concerning Boone's alleged false statements to law enforcement or had any knowledge of it prior to Boone's affidavit. Additionally, Moon could not have gleaned this information from Boone during their time together as fellow inmates because they were in prison in 1995 or 1996, and Boone made the alleged false statements to law enforcement from 1998 to 1999. Moreover, the record does not show there would be any reason for Moon to seek out Boone postprison. In fact, the minutes of testimony do not reveal even a smidgen of any intent on the part of Boone to give false statements to law enforcement at the time he was in prison with Moon.

Accordingly, viewing the record and drawing all legitimate inferences therefrom in the light most favorable to Moon, we find a genuine issue of material fact exists as to whether Moon could have raised the ground of fact earlier. *See Schmidt*, ___ N.W.2d at ___ (holding "[the victim's] recantation was not available to [the defendant] within" the limitations period); *see also Harrington*, 659 N.W.2d at 521 (holding

substantial evidence clearly supported the district court's findings that the defendant could not have discovered the undisclosed police reports and the recantation evidence "earlier than they were discovered in the exercise of due diligence"); *cf. Boss v. Ludwick*, 863 F. Supp. 2d 845, 859 (N.D. Iowa 2012) (holding the defendant knew at the time of his trial that the officer had recorded his conversation because he had seen the officer turn on the recorder, and thus the defendant could have raised his claim that the recording existed earlier).

Second, Moon established a nexus between Boone's admissions and his conviction. The court of appeals held the ground of fact lacked the required nexus with the conviction, reasoning Boone's affidavit only impeached Brodsack's credibility because Boone did not testify at trial and, at most, the affidavit adversely affected the credibility of Brodsack's testimony. However, for purposes of determining whether the exception to the limitations period applies, we do not reach the merits of whether Boone's admissions "would likely or probably have changed the outcome of the underlying criminal case." *Harrington*, 659 N.W.2d at 521 (holding the police reports and the recantation evidence "are the type of facts having the *potential* to qualify as material evidence that probably would have changed the outcome of [the defendant's] trial"); *accord Schmidt*, ___ N.W.2d at ___ (holding "the recantation has the *potential* to qualify as material evidence that probably would have changed the outcome of [the defendant's] case"). We do not automatically exclude impeachment evidence from the potentially material evidence category.[4] *See Aguilera v.*

---

[4]Impeachment evidence may lack the potential to qualify as material evidence if, for example, Moon brought only a newly-discovered-evidence claim because the newly-discovered-evidence test requires "that the evidence is material to the issues in the case and not merely cumulative or impeaching." *Jones v. State*, 479 N.W.2d 265, 274 (Iowa 1991). However, Moon also brought a *Brady* claim. In the *Brady* context, impeachment evidence alone may be material to the issue of guilt and thus has the potential to

*State*, 807 N.W.2d 249, 254–258 (Iowa 2011) (holding the alleged potentially exculpatory evidence impeaches the credibility of the witnesses and is sufficiently material that had the evidence been disclosed, it would have altered the dynamic of the trial). Accordingly, the alleged exculpatory evidence has the potential to qualify as material evidence.

Based on the foregoing, we conclude there is a genuine issue of material fact concerning the statute-of-limitations issue because reasonable minds could differ on the question of whether Moon could have raised the ground of fact earlier. We now turn to the merits.

### V. Due Process Claim: *Brady* Violation.

Moon's claim under section 822.2(1)(*a*) is based on an alleged *Brady* violation arising from the State's failure to turn over exculpatory evidence, such as notes, statements, and interview reports of Boone. Section 822.2(1)(*a*) provides a postconviction-relief applicant a right of action when his or her "conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state." Iowa Code § 822.2(1)(*a*).

To show a *Brady* violation, Moon "must prove by a preponderance of the evidence '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.' " *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011) (quoting *Harrington*, 659 N.W.2d at 516).

**A. Suppression of the Evidence.** For purposes of this appeal, we assume without deciding a genuine issue of material fact exists as to

---

qualify as material evidence. *See DeSimone v. State*, 803 N.W.2d 97, 105 (Iowa 2011) (stating the *Brady* rule encompasses impeachment evidence).

whether the State suppressed the evidence. Thus, Moon would be entitled to a hearing on this element of his *Brady* claim.

**B. Favorable Nature of the Evidence.** The suppressed evidence must have been favorable to the defense. *Harrington,* 659 N.W.2d at 523. Favorability in the context of *Brady* means that had the prosecution disclosed the suppressed evidence and had the defense used such evidence effectively, "it [might have made] the difference between conviction and acquittal." *United States v. Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). The *Brady* rule encompasses both impeachment and exculpatory evidence. *DeSimone,* 803 N.W.2d at 105.

Boone's admissions, specifically that he gave false statements to law enforcement at Brodsack's behest, favor the defense. Brodsack was also a suspect in Dickson's murder and the primary witness who testified against Moon at trial. The suppressed evidence raises suspicion as to Brodsack's motive in allegedly preparing Boone to lie to law enforcement. *See Aguilera,* 807 N.W.2d at 254 (holding the statements contained in the withheld DCI file could impeach a witness and thus were exculpatory). Accordingly, we conclude a genuine issue of material fact exists as to the favorable nature of the suppressed evidence. Thus, Moon would be entitled to a hearing on this element of his *Brady* claim.

**C. Material to the Issue of Guilt.** In addition to the State's suppression of favorable evidence, the evidence must be "material to the issue of guilt." *DeSimone,* 803 N.W.2d at 105. The United States Supreme Court has rejected a distinction between impeachment evidence and exculpatory evidence in the *Brady* context. *Bagley,* 473 U.S. at 676, 683–84, 105 S. Ct. at 3380, 3384. In fact, impeachment evidence can very well be exculpatory. *See Aguilera,* 807 N.W.2d at 254 ("Since all of the statements contained in the file could be used to either impeach a

witness or support alternate interpretations of events, these statements were all clearly exculpatory.").

Materiality depends on whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cornell v. State*, 430 N.W.2d 384, 386 (quoting *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383) (noting we adopted the *Bagley* standard in *State v. Anderson*, 410 N.W.2d 231, 232–34 (Iowa 1987)). Reasonable probability does not require the defendant to demonstrate that the disclosure of the evidence "would have resulted in his [or her] acquittal." *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996). Rather, the defendant establishes reasonable probability when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Harrington*, 659 N.W.2d at 523 (quoting *Strickler v. Greene*, 527 U.S. 263, 290, 119 S. Ct. 1936, 1952 (1999)). We emphasize "reasonable *possibility*" of a different outcome is not sufficient to require reversal. *DeSimone*, 803 N.W.2d at 105 (emphasis added).

When determining materiality, we consider "the totality of circumstances, including the possible effects of nondisclosure on defense counsel's trial preparation." *Cornell*, 430 N.W.2d at 386.

1. *Pending murder charge against Boone.* Boone admitted in his affidavit that he gave false statements to law enforcement because of a pending murder warrant and that the State dismissed the charges against him after he gave his first false statement. However, this admission could not have had any effect, let alone a reasonably probable effect, on the outcome because Boone ultimately did not testify against Moon at trial.

2. *Brodsack's preparation of Boone to give false statements.* The prickly issue is whether disclosure to the jury of Boone's admission that Brodsack prepared him to give false statements creates a reasonable probability that the outcome would have been different had the State disclosed this alleged fact. We examine the trial record to resolve this issue.

Even with the alleged potentially exculpatory evidence, a reasonable fact finder could nevertheless find Moon guilty of first-degree murder. *Schmidt,* ___ N.W.2d at ___ (Cady, C.J., concurring) (stating a jury could still convict the defendant based on the remaining undisputed evidence).

We first examine Brodsack's testimony about a 1990 burglary that occurred days before the murder. Specifically, Brodsack testified he, Moon, Dickson, and Aukes burglarized a building owned by Russell Kerns, and stole two rifles and two pistols in the summer of 1990. Moon allegedly told Brodsack one of the guns came from a pickup truck. Brodsack further testified Moon had the guns in his possession at the house the night before the murder. According to Brodsack, he and Moon used two guns—a revolver and a semiautomatic—to shoot Dickson, and Brodsack recognized the guns as the ones they had stolen from Kerns. Brodsack testified these guns were a .38 and .45.

The testimonies of the Kerns and the police lend credence to Brodsack's testimony on how Moon obtained the murder weapons. Ken Burk, sheriff at the time of the burglary, testified he investigated a burglary at the Kerns property in late July 1990. Burk had tracked down the serial number of one of the stolen guns. That gun was a .38 revolver with the serial number 570-01772.

Madelyn Kerns testified several guns, including a gun inside a pickup truck, and a couple of saddles had been stolen from an outhouse building on their property in July 1990, the same time frame Brodsack testified he and his cohorts committed the burglary. Madelyn further testified her late husband, Russell, had invited the Moon family for a cookout, and Russell showed Moon and Moon's father his gun collection stored in the outhouse building. Madelyn testified Russell was not in the habit of displaying his gun collection, but he showed it to Moon and Moon's father because Russell had known Moon's father for a long time. The cookout occurred at some point in time prior to the burglary. Madelyn admitted she could not recall the exact day of the cookout. Additionally, before his death, Russell told law enforcement on the telephone that he had shown the guns to Moon.

The testimonies of the DCI Agents Michael Motsinger and Victor Murillo corroborate Brodsack's testimony that the .45 caliber gun stolen from the Kerns was one of the guns used in Dickson's shooting death. While executing a search warrant on the abandoned farmhouse property, Motsinger testified he and his team found two .38 caliber shells and one .45 shell inside the cistern. Motsinger further testified they found three .45 shells in the basement. According to Motsinger, he and another agent went to the former Kerns property to search for any type of firearm components. They found two .45 caliber shells on the property. Motsinger testified they transported these shells to the DCI lab for comparison to the shells found at the basement of the farmhouse.

Murillo testified the three .45-caliber shells found in the basement and the two .45-caliber shells found on the Kerns property all came from the same gun. He also testified the shells recovered from the cistern were too damaged to make a positive identification of them.

Aukes corroborated crucial aspects of Brodsack's testimony regarding the details of the murder. Aukes testified that on the morning of the murder, Moon or Brodsack told him they were going to get some drugs. Aukes, Moon, Brodsack, and Dickson went on this morning trip in Moon's car. Aukes testified they all entered the abandoned farmhouse on the main level. Aukes eventually went outside to smoke a cigarette. While retrieving his cigarettes and lighter from the car, Aukes testified that he heard around ten gunshots. Based on his military training, he could tell the gunshots came from two different guns. Around two to three minutes later, Moon and Brodsack rushed out of the house. Aukes testified Moon said they needed to do something about Dickson's body. Aukes, Moon, and Brodsack drove back to Winterset, and Moon retrieved a sledgehammer. They then went back to the farmhouse and attempted to use the sledgehammer to collapse one of the basement walls to cover up Dickson's body.

Aukes testified their efforts with the sledgehammer failed, so the three of them went back outside to come up with another plan. At this time, Brodsack stepped into a large hole located in the center of a lid covering a cistern. They went back to the basement, hauled Dickson's body outside, and dumped the body into the cistern. All these aspects of Aukes's testimony corroborate Brodsack's testimony.

Duane McPhillips's testimony also corroborates Brodsack's testimony concerning how the murder unfolded. McPhillips, an acquaintance of Moon, testified Moon had told him that he, Brodsack, and Aukes lured Dickson out into the country under the guise of a drug buy and then shot Dickson. During direct examination, McPhillips testified Moon did not tell him who actually shot Dickson. During cross-

examination, McPhillips testified Moon told him that he (Moon) had killed Dickson.

The jury took into account some inconsistences in Brodsack's testimony and the testimony of others. For example, Brodsack testified he and Moon sold the revolver while Aukes testified Brodsack told him to throw the revolver in the river. We note based on Aukes's testimony, Motsinger testified he and his team attempted to locate the revolver in the river but did not succeed. However, in June 1999, Motsinger flew to Arizona, where the Kerns were living at the time, and obtained a revolver bearing the serial number 570-01772 from them. Yet another example, Brodsack testified he threw Dickson's wallet in the back seat of Moon's car after dumping Dickson's body into the cistern. However, Motsinger testified that he and his team recovered Dickson's wallet from the cistern. Yet another example, Brodsack testified the night before the murder, Moon, Aukes, and Dickson argued over Aukes's girlfriend named Cindy because Dickson wanted to move away with Cindy. However, Aukes testified he was not involved in this argument and the argument was among Moon, Brodsack, and Dickson, although Cindy was present. The jury knew Brodsack's testimony was certainly not wholly credible and was fully aware of these inconsistencies before returning a guilty verdict against Moon.

The physical evidence does not contradict, although it does not affirmatively corroborate, Brodsack's and Aukes's respective testimonies regarding the number of times Dickson was shot. Dr. Francis Garrity, a forensic pathologist, testified the skeletal remains recovered from the cistern were of Dickson. He further testified Dickson had died of multiple gunshot wounds. Dr. Dawnie Steadman, a physical anthropologist, testified she had found perimortem wounds on the

skeleton, finding nine unambiguous gunshot wounds. She testified this finding did not dictate a finding that nine bullets had passed through Dickson's body because bullets could pass through the body without hitting bones. According to Dr. Steadman, a conservative estimate of the minimum number of bullets producing gunshot wounds was three.

Had the defense known that Brodsack prepared Boone to implicate Moon in the murder, it might have prepared for trial a bit differently. The defense would have probably deposed Brodsack with questions as to why he told Boone to lie to law enforcement. However, from viewing the record, we are unsure whether the defense would have had the opportunity to depose Boone because Boone had absconded. The record does not show when Boone absconded.

Despite some uncertainties as to how the defense would have prepared for trial differently, we find the defense already thoroughly attempted to subvert Brodsack's credibility at trial. The alleged preparation of Boone goes to the question of Brodsack's motive behind downplaying his involvement in the murder or shifting police focus away from himself. The trial record clearly shows the defense vetted this motive.

Regarding the Kerns burglary, the defense challenged Brodsack's testimony that he and his cohorts had stolen two rifles and two pistols when in fact the Kerns had reported two saddles, nine guns, and a Bowie knife as stolen. The defense also cross-examined Aukes concerning inconsistencies between some aspects of Aukes's testimony and Brodsack's testimony.

More importantly, the defense fully cross-examined Brodsack concerning the "pack of lies" he told the DCI concerning the murder. In an April 29, 1999 interview, Brodsack told the DCI that Dickson was in

Colorado when, in reality, Dickson was already dead. Brodsack admitted at trial he had told an elaborate story and had persisted for about an hour telling the DCI "absolute nothing but lies."

The defense highlighted that Brodsack changed his story during the second half of the April 29 interview when the DCI told him it would be in his best interest to start telling the truth. Instead of telling the truth, Brodsack lied yet again. This time, Brodsack lied that Moon and McPhillips took him out to the farmhouse to show him Dickson's body. Brodsack further lied that his fingerprints were on some of the debris in the cistern because he had thrown some trash down there when he was at the farmhouse property with Lovely. During this same April 29 interview, Brodsack changed his story yet again after the DCI disclosed to him they knew he was present at the farmhouse when Dickson was murdered. Brodsack lied he was in the car at the time of the murder and stated he did not know if Moon was the person who pulled the trigger.

During a continuation of the April 29 interview the following day, Brodsack told the DCI he was waiting in the car when he heard gunshots, and Moon and McPhillips came rushing out of the farmhouse. Brodsack then went down to the basement, with one hand on the railing and the other on the wall and, upon seeing Dickson lying on the ground, kicked him to see if he was dead. Brodsack admitted at trial this retelling of the events was a lie.

The defense again emphasized Brodsack's "pack of lies" and the different versions of the events he had told the DCI. The defense also prodded Brodsack's motive for going to the authorities on April 29, pointing out Lovely had shown up at Brodsack's house in the evening of that day to talk about the murder. The defense portrayed Brodsack as a liar who purposefully agreed to the April 29 interview to shift police focus

away from himself and to Moon and other individuals, such as McPhillips.

The defense's theory of the case focused on Brodsack's presumed history of blaming other individuals for his crimes and his penchant for lying. In fact, the defense impeached, or at least attempted to impeach, Brodsack's credibility by delving into his past forgery and fraudulent practice charges. Forgery and fraudulent practice go to the very heart of veracity, thus casting doubt on Brodsack's testimony. The defense also brought up the plea deal between Brodsack and the State in which the State agreed to reduce the charge against him from first-degree murder to second-degree murder in exchange for truthful testimony at trial. We conclude the record shows the defense thoroughly impeached Brodsack's credibility at trial.

In addition to the defense's persistent attempts to poke holes at Brodsack's credibility and portrayal of Brodsack as a suspect attempting to shift police focus away from himself, the State laid out its cards, although for strategic reasons, for the jury and the defense. The State admitted in its opening statement that Brodsack had originally lied to the DCI, denying his involvement in the murder. The State further admitted Brodsack changed his story a number of times in the face of additional evidence and continued to lie. Furthermore, the State disclosed to the jury that it had originally charged Brodsack with first-degree murder, but made a plea deal with him to reduce the charge to second-degree murder if Brodsack testified truthfully about Dickson's murder. Thus, Brodsack had motive to testify against Moon. *Cf. Bagley*, 473 U.S. at 683–84, 105 S. Ct. at 3384 (reasoning the prosecutor's failure to disclose any monetary inducements, as well as its disclosure of affidavits stating the witnesses received no promises of a reward, misled the defendant to

believe that the witnesses could not be impeached when, in actuality, "the possibility of a reward gave [the witnesses] a direct, personal stake in [the defendant's] conviction").

The de minimis effect of the allegation that Brodsack prepared Boone would not have changed the outcome at trial. We have stated "[w]ithholding impeachment evidence can [amount to] a *Brady* violation, *but when a witness's testimony has been otherwise impeached with prior inconsistent statements*, we are less likely to find the impeaching statements would have impacted the outcome of the trial." *Aguilera*, 807 N.W.2d at 254 (emphasis added). In other words, the impeachment value of Brodsack's alleged preparation of Boone to give false statements is incremental. *See Rowe v. Grizzard*, 591 F. Supp. 389, 397 (E.D. Va. 1984) (stating if suppressed impeachment evidence would have had no significant effect on the witness's credibility, there is no due process violation); *accord Romeo*, 542 N.W.2d at 552.

At the end of trial, the jury could fully appreciate the fact that Brodsack may not be a truthful person and could be lying on the witness stand about how Dickson's murder unfolded. The trial record indicates the jury knew Brodsack mostly lied to the authorities before he finally told them the presumed complete story in December 1999 when he signed the plea agreement. Despite Brodsack's previous lies to the authorities, the jury found Brodsack's trial testimony presumably truthful or at least worthy of some degree of credence. Given this premise, we find the jury could reasonably lump the alleged fact that Brodsack prepared Boone to give false statements as just another one of Brodsack's attempts to shift police focus away from himself before he finally decided to tell the authorities the truth in December 1999. Thus,

we do not think the alleged potentially exculpatory evidence would have "le[d] to a new dynamic at trial." *Aguilera*, 807 N.W.2d at 257.

We realize the only two individuals towering over Dickson's body in the basement on that fateful day were Moon and Brodsack. Moon did not testify at his own trial. Thus, Brodsack was the only witness who gave a firsthand account of what unfolded in the basement. However, Boone's allegation that Brodsack prepared him to give false statements to law enforcement, at best, casts another shadow of doubt on the credibility of Brodsack's testimony, which already loomed with clouds of doubt even without the alleged newly discovered evidence. *Cf. Cornell*, 430 N.W.2d at 386 (holding the stepbrother's "testimony was otherwise impeached because of several inconsistent statements" and further impeachment with the first alleged exculpatory statement would not undermine confidence in the defendant's conviction).

Admittedly, there are similarities between *Harrington* and the case at hand. In *Harrington*, the jury knew the primary witness was a liar: he had named three other individuals before finally pointing the finger at the defendant. 659 N.W.2d at 524. Moreover, the jury knew the state agreed to drop various theft and burglary charges in exchange for his testimony against the defendant. *Id.* at 515. Yet, in *Harrington*, we found the questionable veracity of the primary witness was not what "undermine[d] our confidence in the defendant's trial" because "[the primary witness's] ability and propensity to lie were well known" at the time of the trial. *Id.* at 524. Rather, we reasoned the primary witness's unreliability was "important groundwork . . . because this circumstance makes it even more probable that the jury would have disregarded or at least doubted [the primary witness's] account of the murder had there been a true alternative suspect." *Id.* Had the defense known about the

information contained in the police reports, the defense would have zeroed in on the alternative suspect and would have used the suspect "as the centerpiece of a consistent theme that the State was prosecuting the wrong person." *Id.* Here, unlike in *Harrington*, the defense knew about all potential alternative suspects. Moreover, as we have already established, the defense zeroed in on Brodsack.

We conclude even if the State had disclosed to Moon the alleged interference on the part of Brodsack and the defense had used the information to impeach Brodsack's testimony, there is no reasonable probability that the outcome of trial would have been different. Moon fails to undermine our confidence in the outcome at trial and ultimately fails to establish a valid *Brady* violation. Because Brodsack's preparation of Boone is not material to the issue of guilt, Moon's conviction does not violate his due process right to a fair trial. Accordingly, we find there is no genuine issue of material fact on the materiality of the suppressed evidence because the suppressed evidence has no reasonable probability of changing the outcome of trial. Thus, Moon fails to fulfill this element of his *Brady* claim.

Because no genuine issue of material fact exists on the third element that is required to prove a *Brady* violation, the State is entitled to a judgment as a matter of law on Moon's *Brady* claim.

## VI. Newly-Discovered-Evidence Claim.

Moon next alleges Boone's affidavit, specifically Boone's admissions that he gave false statements to law enforcement at Brodsack's behest and because of a pending murder warrant, constitutes newly discovered evidence pursuant to Iowa Code section 822.2(1)(*d*). Section 822.2(1)(*d*) gives a postconviction-relief applicant a right of action when "[t]here exists evidence of material facts, not previously presented and heard,

that requires vacation of the conviction or sentence in the interest of justice." Iowa Code § 822.2(1)(*d*).

To prevail on his newly discovered evidence claim, Moon must show by a preponderance of the evidence

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*Jones v. State*, 479 N.W.2d 265, 274 (Iowa 1991); *Jones v. Scurr*, 316 N.W.2d 905, 907 (Iowa 1982).

**A. Discovered After the Running of the Three-Year Statute of Limitations.** The obvious fact is that Boone's 2011 affidavit came after Moon's 2000 trial. The question is whether Moon discovered the contents of Boone's affidavit after the verdict. In *Jones*, a defendant alleged the postjudgment testimonies of his two codefendants constituted newly discovered exculpatory evidence. 316 N.W.2d at 906–07. The first codefendant had invoked his privilege against self-incrimination at the defendant's hearing on a motion for new trial and had allegedly refused to testify at defendant's trial. *Id.* at 907–08. The second codefendant was a fugitive at the time and therefore did not testify at the defendant's trial or hearing. *Id.* at 908. We held the testimonies did not constitute newly discovered evidence because the defendant knew about the evidence even though it was unavailable at the time of trial. *Id.* at 910.

Unlike the defendant in *Jones*, the record shows Moon did not know at the time of trial or within the applicable limitations period that Boone gave false statements to law enforcement for whatever Boone's reasons. Because the potentially exculpatory evidence was unavailable

and unknown to Moon within the appropriate limitations period, we find a genuine issue of material fact exists as to whether Moon discovered the evidence in question after the verdict. Thus, he would be entitled to a hearing on this element of his newly-discovered-evidence claim.

**B. Could Not Have Been Raised Earlier in the Exercise of Due Diligence.** The burden is on Moon to demonstrate he could not have raised the newly discovered evidence earlier in the exercise of due diligence. Moon has met this burden. Specifically, he exhausted the probable sources of information related to this case. The record shows on January 27, 2000, Moon filed a motion to produce evidence concerning Boone's proposed testimony. Moon further requested to depose Boone. However, Moon did not have the opportunity to depose Boone or investigate Boone's May 1999 statements to the DCI because Boone had absconded. The State had to issue a warrant to arrest him as a material witness. By the time the State informed Moon that Boone was in custody, it was already June 9, 2000, and the trial was set for June 12. Moreover, following his arrest, Boone refused to participate in any interviews by the State or the DCI. At this point, it appears Boone did not want to cooperate with any parties involved in the case.

Additionally, in his January 2011 affidavit, Moon declared he had never seen any police reports or investigative notes concerning Boone's alleged false statements to law enforcement or knew of this information prior to obtaining the affidavit. Furthermore, as mentioned before, Moon could not have obtained this information from Boone during their time together in prison in 1995 or 1996 because Boone made the alleged false statements to law enforcement from 1998 to 1999.

We acknowledge Moon did not call Boone to testify at trial. *See id.* at 910 n.1 (noting it was "questionable whether [the first codefendant]

was unavailable at trial" when the defendant failed to call the codefendant to testify at trial despite the codefendant's alleged refusal to so testify). However, we have stated, "The showing of diligence required is that a reasonable effort was made. *The applicant is not called upon to prove he sought evidence where he had no reason to apprehend any existed.*" *State v. Compiano*, 261 Iowa 509, 519, 154 N.W.2d 845, 850 (1967) (emphasis added) (quoting *Westergard v. Des Moines Ry.*, 243 Iowa 495, 503, 52 N.W.2d 39, 44 (1952)). Moon filed a motion to exclude Boone's testimony because it appears Moon believed Boone's proposed testimony, as memorialized in the minutes of testimony, would harm Moon's defense.

Moreover, according to Boone's affidavit, had Boone testified at trial, he would have given the same story that Brodsack allegedly prepared him to give to law enforcement. Thus, even if Moon had called Boone to testify on the witness stand, Moon could not have discovered the alleged false statements before the verdict.

Lastly, nothing in the trial record shows the defense became aware of the possibility that Brodsack had prepared Boone to implicate Moon in the murder. *Cf. id.* at 519, 154 N.W.2d at 851 (holding the defendant failed to exercise due diligence when he knew of the possibility of the officer's mistake during the officer's testimony at trial yet did not ask for a continuance after failing to locate the officer during the noon recess). Accordingly, we find a genuine issue of material fact exists as to whether Moon exercised due diligence in attempting to depose Boone and investigate the May 1999 interview, and could not have raised the alleged potentially exculpatory evidence earlier. Thus, he would be entitled to a hearing on this element of his newly-discovered-evidence claim.

**C. Material and Not Merely Cumulative or Impeaching.** At most, the alleged exculpatory evidence is merely impeaching of Brodsack's testimony and therefore not considered material in the context of a newly-discovered-evidence claim. Accordingly, because Moon fails to establish by a preponderance of the evidence that the evidence is material, there is no genuine issue of material fact concerning materiality. Thus, he fails to fulfill this element of his newly-discovered-evidence claim.

**D. Probably Would Have Changed the Result.** Moon's alleged exculpatory evidence probably would not have changed the result. First, Boone did not testify at trial. Had Boone testified, the State's case would have been stronger because, according to the affidavit, Boone would have stuck to the same story Brodsack had prepared him to tell law enforcement.

Second, the State proved Moon committed first-degree murder beyond a reasonable doubt "independent of the retracted testimony" Boone originally gave to law enforcement in May 1999. *See id.* at 518, 154 N.W.2d at 850 ("Mere recantation of a witness on any material matter should not necessitate a new trial if, eliminating such evidence, there is still substantial evidence to support the jury's verdict.").

Third, as we discussed in the *Brady* context, Moon fails to show that the newly discovered evidence would have probably changed the outcome. *See Cornell,* 430 N.W.2d at 386–87 (applying the *Brady* materiality test requiring a reasonable probability to the probability prong of a newly-discovered-evidence claim); *see also Compiano,* 261 Iowa at 520, 154 N.W.2d at 851 (stating the test is whether "there is a reasonable probability of a different result upon another trial" (quoting *Westergard,* 243 Iowa at 500, 52 N.W.2d at 43)). Even if Brodsack did in

fact prepare Boone and the defense utilized this evidence efficiently at trial, the jury could still find Moon guilty based solely on the evidence that was available at trial.

We find there is no genuine issue of material fact as to Moon's failure to carry his burden that the newly discovered evidence probably would have changed the result. Thus, he fails to fulfill this element of his newly-discovered-evidence claim.

In sum, because no genuine issue of material fact exists on two of the elements needed for a successful newly-discovered-evidence claim, the State is entitled to a judgment as a matter of law on Moon's newly-discovered-evidence claim.

### VII. Disposition.

We vacate the decision of the court of appeals. However, we affirm the judgment of the district court summarily dismissing Moon's postconviction-relief application.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Hecht, J., who takes no part.