# IN THE COURT OF APPEALS OF IOWA

No. 22-0437
Filed September 27, 2023

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**MICHAEL JAMES SHIVERS,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Webster County, James A. McGlynn

(trial and motion for new trial) and Angela L. Doyle (sentencing), Judges.


Michael Shivers appeals his convictions for second-degree murder.
**AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg,

Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Richard J. Bennett, Special Counsel,

for appellee.


Considered by Tabor, P.J., Schumacher, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**DANILSON, Senior Judge.**

Michael Shivers appeals his convictions for second-degree murder. He challenges the sufficiency of the evidence supporting his convictions, claiming the State failed to prove he was not justified in the shooting deaths of Jameal Cox and Tyrone Cunningham. He further contends the district court abused its discretion in denying his motion for a new trial based on newly-discovered evidence. Upon our review, we affirm.

## I.    *Background Facts and Proceedings*

In the early morning hours of June 16, 2020, tension grew between two groups congregated on opposite sides of a residential street in Fort Dodge. Both groups were armed, and the situation was "at a stalemate." Eventually, a shot was fired, and a gun battle ensued. Cox and Cunningham were both shot and died from their wounds.

Shivers was charged with two counts of murder in the second degree.[1] Shivers raised the defense of justification. The matter proceeded to trial, and the jury found him guilty of murder as charged. Shivers appeals. Facts will be set forth below as relevant to the issues raised.

## II.    *Sufficiency of the Evidence*

The district court instructed the jury the State had to prove the following elements of murder in the second degree:

> 1. On or about the 16th day of June 2020, the Defendant shot Jameal Cox [/Tyrone Cunningham].

---

[1] Shivers was also charged with possession of a firearm as a prohibited person, but the court granted his motion for judgment of acquittal on that count upon finding the State had failed to prove he had knowledge he was prohibited from possessing firearms.

2. Jamael Cox [/Tyrone Cunningham] died as a result of being shot.

3. The Defendant acted with malice aforethought.

4. The Defendant was not justified.

The jury also received instructions on justification. Instruction 34 stated:

The defendant claims he was justified in using reasonable force to prevent injury to a person, including the defendant.

The defendant was justified in using reasonable force if he reasonably believed that such force was necessary to defend himself from any actual or imminent use of unlawful force.

Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury. If in the defendant's mind the danger was actual, real, imminent, or unavoidable, even if the defendant was wrong in estimating it or the force necessary to repel it, the force was justified if the defendant had a reasonable basis for his belief and responded reasonably to that belief.

It is not necessary that there was actual danger, but the defendant must have acted in an honest and sincere belief that the danger actually existed. Apparent danger with the defendant's knowledge that no real danger existed is no excuse for using force.

Reasonable force can include deadly force if it is reasonable to believe that such force is necessary to resist a like force or threat, or avoid injury or risk to one's life or safety.

The State must prove beyond a reasonable doubt that the defendant's use of force was not justified.

Instruction 36 stated:

If any of the following is true, the defendant's use of force was not justified:

1. The defendant did not have a reasonable belief that it was necessary to use force to prevent an injury.

2. The defendant used unreasonable force under the circumstances.

If the State has proved any of these beyond a reasonable doubt, the defendant's use of force was not justified. A person is justified in using reasonable force, including deadly force, if he reasonably believes the force is necessary to defend himself from any actual or imminent use of unlawful force.

And instruction 37 stated:

If any of the following is true, the defendant's use of force was not justified:

page 4

1. The defendant initially provoked the use of force against himself, intending to use it as an excuse to injure a person.
2. The defendant initially provoked the use of force against himself by his unlawful acts unless:
   a. A person used force grossly disproportionate to the defendant's provocation, and it was so great the defendant reasonably believed he was in imminent danger of death or serious injury, or
   b. The defendant withdrew from physical contact with a person and clearly indicated to the person that he desired to terminate the conflict but the person continued or resumed the use of force.
If the State has proved any of these beyond a reasonable doubt, the defendant's use of force was not justified.

Shivers challenges the sufficiency of the evidence to sustain his convictions, arguing he "was justified in standing his ground and using a gun to protect himself and the people [with him]." We review this claim for correction of legal error. *State v. Schiebout*, 944 N.W.2d 666, 670 (Iowa 2020). "We will uphold the verdict on a sufficiency-of-evidence claim if substantial evidence supports it." *Id.* "Evidence is substantial 'if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019)).

From the evidence presented at trial, the jury could reasonably have found the following facts. On the evening of June 15, 2020, and into the early morning hours, Shivers and various family members and friends gathered in the front yard of his brother Doc's house for a celebration of life for Shivers's sister. The group was drinking, "hanging out," and having a cookout. At some point during the evening, Shivers's son Deion retrieved his AR-15 from the trunk of his car, where he usually kept it, and "show[ed it] off" to people. The rifle was not loaded, but

Deion had ammunition in the trunk and also "in the center console" of the car. After Deion was done displaying the rifle, he "[p]ut it back in the trunk."

During the gathering, Shivers told the group about a "guy [known by the name 'Man Man'] who had pulled a gun out on [Deion]." As the evening progressed, tensions grew between Shivers's group and another group of people that had formed "across the street" near a park. Shivers told his group that he "kept seeing [Man Man] walking by, riding through." Shivers's other son, Michael, walked behind Doc's house to make sure no one was "coming from the back way." Michael learned from a friend behind the house that "some guys," including Man Man, "had pulled some guns out" in the back alley. This prompted Michael to go inside the house and retrieve a nine millimeter handgun. Michael put the gun in his pants and went to the back alley, but he "didn't see anything." Michael then walked to the street and "stopped and talked" to some people in the other group by the park, but he didn't see anyone with guns or sense any "hostility."[2] When he got back to the house, Shivers told Michael "there's a car parked down here on the side of the church." Michael went to "go check it out," but "there was not a car there."

Meanwhile, Shivers had armed himself with Deion's rifle, and other members of the group, Jeremiha and DJ, had also retrieved handguns. Shivers told the group he saw "somebody passing out guns" in the street. The group was instructed to "get the fuck down or go inside [Doc's house], get out of the way." Deion thought "a fist fight" was about to take place. Deion, who was unarmed, got

---

[2] Another person from the Shivers group also described members of the two groups as "comingling" and talking to each other in a friendly manner.

down by a vehicle, which he thought was "the safest spot." Then he "froze" and heard a "bunch of noise" as shots were fired. Deion "didn't see anybody shoot anything," but he saw Shivers "holding" his rifle. Deion acknowledged that Shivers was shooting in the direction of the park and that Shivers "could" have fired the first shot. Deion fled to a back fence, and then he went inside.

Michael also saw Shivers holding the rifle prior to the shooting. Michael was just about to "go get [his] Uncle Doc" to "diffuse" the situation when "the first shot happened." Michael testified the first shot "came from our side," and he "saw [Shivers] fire the shot." Michael then "took cover," and he could "[n]ot really" tell where the shots were coming from; after Shivers's first shot, "[t]he firing was continuous." Michael stated he shot a "[f]ew times" "[t]owards the park." He also acknowledged he had not told police "everything [he] knew about the case" when he was first interviewed "[b]ecause [he] didn't want to get anybody in trouble." Michael further testified if Shivers had not first fired the rifle, he wouldn't have shot his gun.

Jeremiha testified Shivers was holding the rifle and pointing it toward the park before the shooting began. Jeremiha stated Shivers "fired the first shot," and then "[s]hots began to fly" from both sides. Jeremiha, who was also armed, acknowledged he had fired "[t]hree" shots. But Jeremiha testified, "The rifle shot was the first shot that went off."

Cox's wife, Savena, testified she and Cox were talking to friends in the street in front of Doc's house on what "seemed like just a normal night." But "a few minutes before the shooting," she "start[ed] getting weird vibes" and noticed the Shivers group was "being very shifty." Savena testified she heard shots coming

from "the Shivers' house" and "saw flame from over there," and "then right after that, they just continued to keep coming."[3]  Savena saw Cox "had been shot." Savena did not "hear any gun fire [coming from] closer to [her]," and she did not "see anybody around [her] area" with a firearm.

Police arrived to the scene shortly after the shooting.  Cox, who was found lying in the street, did not have a pulse.  The medical examiner testified Cox's cause of death was a "gunshot wound to the chest" and agreed his wound was "consistent with a high-powered rifle being used."  Meanwhile, police arrived to the scene of a car accident several blocks away.  The driver, Cunningham, had suffered a bullet wound to the leg that had struck a "major artery."  Cunningham died shortly thereafter.  The medical examiner testified his cause of death was "[b]lood loss due to gunshot wound of the left leg" and agreed his wound was "consistent with [being inflicted by] a high-powered rifle."[4]

Police spoke to Shivers "very brief[ly]" at the scene following the shooting, during which he did not say anything about "being shot at" or "acting in self-defense."  A detective interviewed Shivers a few days later.  Shivers "described [the shooting] as a simultaneous eruption of shots and he wasn't able to say which side started first."  Shivers commented, "Maybe both sides got tired of waiting to see who was going to back down first."  Shivers "said with 100 percent certainty he never had a gun and with 100 percent certainty that he had any ammunition or

---

[3] Savena testified she heard a pistol first and then a rifle; "[i]t was like consecutive. It was—it didn't seem like there was a pause in between.  I heard that shot, thought it was firecrackers, looked at my husband and he was shot and at that point it's continuous shooting."

[4] There was no evidence of a rifle being used during the gunfire except the AR-15.

touched a gun or ammunition that night." And when asked whether he acted in self-defense, "He said he didn't have a gun, had no reason to have a gun, the issue didn't involve him or his family, it was involving one person that they were looking for, so he repeatedly denied having access to a gun or touching a gun at that point."

Another officer interviewed Shivers a few days later. This time, Shivers "claimed that he thought that Dinky may have fired the first shot."[5] Shivers further said there were six shooters from his group, and that he shot "three to four rounds" on "a .38 caliber revolver" toward the group "down the street." Shivers stated "that he was aiming towards Man-Man and he hoped he shot him." Shivers told the officer that his son Deion was "inside sleeping" when the shooting took place and his other son Michael had "left or had disappeared before the shooting started." Shivers did not admit to shooting the rifle, nor did he mention self-defense.

That same officer interviewed Shivers again approximately ten days later. Shivers again stated he fired a .38 revolver, and "[a]gain, he denied shooting the rifle, although he did talk about touching and holding the rifle" when Deion was showing it to people earlier in the evening. A .38 caliber revolver was never found.[6] Ultimately, law enforcement determined that one person had fired shots from the park side of the street. Law enforcement ultimately concluded "Shivers fired the first shot," using the AR-15.

Shivers did not testify. Shivers's brother, Ira, testified for the defense, stating he stopped by Doc's house for "[a]bout 10, 15 minutes" earlier in the

---

[5] James Davis, who goes by the name Dinky, was on Shivers's side of the street that evening and during the shooting.
[6] Shivers told police they "would never find it."

evening before the shooting took place. Shivers's niece, Cierra, also testified, and stated she was present before and during the shooting. Cierra testified the mood "changed" after Man Man came over to talk to their group and that Man Man was wearing a gun on his hip. But she acknowledged she did not "leave" or "go home" and she was not in fear for her safety. Cierra further testified Man Man neither threatened nor pulled his gun out to anyone. Cierra could not recall who took the "first shot," but she stated the only person she saw with a gun was DJ.

On appeal, Shivers argues "there was plenty of evidence that [he] was justified in standing his ground and using a gun to defend himself and the people gathered at the celebration of life." As support for his claim, he points to evidence that Man Man, who "was known to be dangerous" and "had problems with at least one other person" in his group, "was present, displayed a gun, and instilled fear in the people who were there." In sum, Shivers claims he "was acting with justification and the State clearly failed to prove that he was not."

Upon our review, we conclude the record before us furnishes substantial evidence from which a jury could find, beyond a reasonable doubt, that Shivers's reliance on the defense of justification was unfounded. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (noting the jury is free to believe or disbelieve the evidence and to give weight to the evidence as it sees fit). The State refuted the defense with proof that Shivers fired the first shot, effectuating an end to the "stalemate," using an AR-15.[7] *See State v. Fordyce*, 940 N.W.2d 419, 426 (Iowa 2020) ("The State can meet its burden [to prove justification did not exist] by

---

[7] In sum, three witnesses testified that they observed Shivers with the AR-15, and two of them stated that Shivers fired the first shot.

proving . . . [t]he [d]efendant started or continued the incident which resulted in death."); *State v. Wilson*, 941 N.W.2d 579, 591 (Iowa 2020) (finding substantial evidence to prove lack of justification where defendant started the confrontation).

The jury could also find there was tension between the groups but no imminent threat. Multiple witnesses testified neither Man Man nor his group were vocally threatening the Shivers group and described nonthreatening interactions between the groups that had taken place not long before the shooting. *See State v. Jenkins*, No. 21-1718, 2023 WL 4759448, at *7 (Iowa Ct. App. July 26, 2023) ("[S]ubstantial evidence shows that Jenkins 'escalated the level of force beyond what was reasonable under the circumstances.'" (quoting *State v. Seley*, No. 22-0419, 2023 WL 2148800, at *6 (Iowa Ct. App. Feb. 22, 2023))). Further, Shivers's varying and contradictory statements in three interviews after the shooting, as well as an absence of statements that he acted in self-defense, demonstrate his consciousness of guilt. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) (referencing fabrication as indication of a consciousness of guilt); *State v. Van Hemert*, No. 19-1273, 2020 WL 5944441, at *4 (Iowa Ct. App. Oct. 7, 2020) (noting jurors could believe that someone who truly believed they acted in self-defense would not hide evidence or lie to authorities).

In sum, we conclude there is sufficient evidence in the record to show the State met its burden to disprove Shivers's defense of justification, and we affirm on this issue. Substantial evidence supports Shivers' convictions for murder in the second degree.

### III.     Newly-Discovered Evidence

Shivers filed a motion for new trial, alleging he had discovered the following new evidence: "A witness failed to disclose pertinent information as it relates to a 'hit' on one of the victims, and that this witness had been threatened not to disclose pertinent information."  Shivers further claimed, "This information is relevant as it relates to witnesses who testified at the trial and rebuts their testimony in [his] favor" and he was "prejudiced as he was unable to investigate this information for trial and would have likely changed the result."  Following a hearing, the district court entered an order denying Shivers's motion.

Shivers challenges the court's ruling on appeal.  A new trial may be granted "[w]hen the defendant has discovered important and material evidence in the defendant's favor since the verdict, which the defendant could not with reasonable diligence have discovered and produced at the trial."  Iowa R. Crim. P. 2.24(2)(b)(8).  A motion for new trial based on newly-discovered evidence may be granted if the evidence "(1) was discovered *after* the verdict, (2) could not have been discovered earlier in the exercise of due diligence, (3) is material to the issues in the case and not merely cumulative, and (4) probably would have changed the result of the trial."  *State v. Linderman*, 958 N.W.2d 211, 223 (Iowa Ct. App. 2021) (citation omitted).  These factors must be shown by a preponderance of the evidence.  *Moon v. State*, 911 N.W.2d 137, 151 (Iowa 2018).  We review the district court's ruling on a motion for new trial based on newly-discovered evidence for an abuse of discretion.  *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022).

At the hearing on his motion for new trial, Shivers presented testimony from his niece, Chyla Shivers, and private investigator Scott Gratias. The court summarized their testimony as follows:

> After the evidentiary record was closed in this case, the defendant's niece, Chyla Shivers, came forward with her recollection of a conversation with one of the original co-defendants, James Davis, street name "Dinky." She met with the defendant's private investigator, Scott Gratias, after the verdict was received and told him that "Dinky" had confided in her that he had accepted a contract to kill Tyrone Cunningham. She developed a theory that since "Dinky" had agreed to kill Tyrone Cunningham, and since Tyrone Cunningham was found dead from a bullet wound after being observed traveling down a street in his car some few blocks from the celebration of life gathering, it might well be that "Dinky" shot Tyrone Cunningham in a completely separate incident. Notably her theory does not account for the shooting death of Jamael Cox.
>
> Scott Gratias did not believe that Ms. Shivers' theory was important and material evidence in the defendant's favor on the question of whether the defendant fired the gun which caused the death of Tyrone Cunningham. Instead, the investigator believed that "Dinky" had the motivation to incite the people who were still present at the celebration of life gathering to do his dirty work for him. There was evidence at trial that the mood at the party had changed. Several witnesses testified at trial that the mood of the party shifted dramatically over a short period of time and that many of the people present were on edge and anxious. Specifically, they were made aware of a sighting of Isaiah Mosley, street name "Man Man," who had a reputation for being a very violent and dangerous person. It was believed that "Man Man" had participated in an earlier shooting directed at this household. There was some concern that "Man Man" and others might be staging a drive-by shooting. There was also evidence that "Dinky" was at the gathering and that he had a gun in his possession.

Ultimately, the court determined Shivers failed to establish the second and third factors—that the newly-discovered evidence could not have been discovered earlier in the exercise of due diligence and was material to the issues in the case and not merely cumulative. *See Linderman*, 958 N.W.2d at 223. With regard to the second factor, the court observed Gratias conducted a "short and basic"

interview of Chyla, which included asking "who, what, and when." The court noted an exercise of reasonable diligence would have also included asking the other "W" question "commonly asked by reporters and investigators"—"why." The court observed, "It is reasonably likely that had the investigator asked [Chyla], 'Do you know why anyone would want to kill Tyrone Cunningham or Jamael Cox?' her memory would have been jolted and the information concerning a possible contract hit on Tyrone Cunningham would have been provided prior to the trial."

In regard to the third factor, the court found:

[T]he so-called evidence is really nothing more than a theory arrived at by [Chyla] and then reimagined by the investigator. In [Chyla's] theory, the defendant might not be guilty of the murder of Tyrone Cunningham because it is possible the bullet which killed Tyrone Cunningham was fired by "Dinky" rather than Michael Shivers, at some other time or place. Apparently the investigator does not accept [Chyla's] theory that the defendant should be exonerated from the act of firing the bullet which killed Tyrone Cunningham. Rather, Mr. Gratias asserts that evidence of a contract for the murder of Tyrone Cunningham is important and material evidence in the defendant's favor on the issue of self-defense. However, the record already showed that the defendant and other members of the group were fearful and on edge. At the most, this "newly discovered" evidence suggests that "Dinky" should be given some credit or blame for inciting those fears and passions but the identity and motives of the person stirring the pot are not important and relevant to this defendant's case. If the theory can be proved then "Dinky" may have some culpability of his own, but it would be in addition to the culpability of Michael Shivers, not in place of it. Regardless, the fears and concerns did not give Michael Shivers permission or license to fire the first shot. Self-defense and stand your ground justifications do not allow for the use of preemptive strikes. Even if "Dinky" cleverly and single-handedly orchestrated the execution of Tyrone Cunningham by the defendant, the defendant was still responsible for his own actions.

The district court "is generally in a better position than we to determine whether evidence, newly discovered, would probably lead to a different verdict upon retrial, and we have often said we will not interfere with its ruling unless it is

reasonably clear that such discretion was abused." *State v. Compiano*, 154 N.W.2d 845, 849 (Iowa 1967). We cannot find the court exercised its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable" as the Court thoroughly considered the testimony and gave sound reasons in reaching its conclusion.[8] *See State v. Jefferson*, 545 N.W.2d 248, 251 (Iowa 1996). Accordingly, Shivers has not shown the district court abused its discretion in denying his motion for new trial based on newly-discovered evidence.

We affirm Shivers's convictions for second-degree murder.

**AFFIRMED.**

---

[8] We also note Dinky was at the gathering according to trial testimony, and not a few blocks down the street where Cunningham ultimately succumbed to his injury.