**IN THE COURT OF APPEALS OF IOWA**

No. 19-1336
Filed February 17, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**RANDY LOUIS LINDERMAN,**
        Defendant-Appellant.
_____


        Appeal from the Iowa District Court for Jasper County, Richard B. Clogg,

Judge.


        Randy Linderman appeals his conviction of first-degree murder.

**AFFIRMED.**


        Christine E. Branstad and Nathan A. Olson of Branstad & Olson Law Office,

Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney

General, for appellee.


        Heard by May, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Randy Linderman appeals his conviction of first-degree murder following a jury trial in November 2018. He claims the district court erred in denying (1) his motion to strike a juror for cause; (2) his motion for judgment of acquittal on the basis there was insufficient evidence to convict; and (3) his motion for a new trial on the basis the jury's verdict was contrary to the weight of the evidence. Linderman also contends newly discovered evidence requires remanding for a new trial. We find no abuse of discretion involving jury selection and substantial evidence supports the verdict. Linderman is not entitled to a new trial, and we affirm the conviction.

**I. Facts and Earlier Proceedings.**

Jose Louis Ramirez-Berber (Berber) was discovered dead in his rural Jasper County home on March 6, 2017. After several calls to reach him, Berber's mother sent a relative to the home to check on Berber.[1] Upon arrival at the home, the relative noticed all the lights were off and the door was wide open with a broken doorframe. This door was typically locked. As he entered, he found Berber lying on the floor with a plastic bag partially covering his face and Berber's body stiff and cold to the touch. Fearing the worst, he called 911. Paramedics responded and observed trauma to Berber's face and blood from his nose and ear pooled below his head. The paramedics confirmed Berber was deceased before contacting the Jasper County Medical Examiner and the sheriff's office.

---

[1] Cell phone records show Berber last answered his phone at 9:38 a.m. on March 6. Between 4:02 p.m. and 6:19 p.m., Berber missed six phone calls from his mother.

Sheriff John Halferty responded to the scene in his capacity as the Jasper County Medical Examiner's investigator rather than as a law enforcement officer. However, upon observing the broken-in door, he suspected foul play and began investigating the home as a possible crime scene in his capacity as a law enforcement officer. Sheriff Halferty contacted the Iowa Division of Criminal Investigation (DCI) for assistance. A team of DCI agents and two DCI criminalists were dispatched to investigate, led by Special Agent Don Schnitker.

Because the cause of death appeared suspicious, the Iowa Medical Examiner's Office performed an autopsy of Berber's body. The state medical examiner ruled the manner of death a homicide and found it was caused by blunt-force trauma to the head. The autopsy revealed DNA samples from an unknown individual in the form of sperm in Berber's underwear as well as seminal fluid obtained from a rectal swab.[2] The DCI crime lab developed a DNA profile from these samples and later matched the DNA to a buccal swab collected from Linderman in an earlier criminal proceeding.

In the early stages of the investigation, before considering Linderman a suspect, investigators learned of video footage from a neighbor's home surveillance camera situated on a gravel road roughly two miles northeast of Berber's home. The camera recorded a white Buick sedan with a sunroof, spoked wheels, and curved headlights heading eastbound away from Berber's home at 11:41 a.m. on March 6. At 12:23 p.m. the camera recorded what appears to be

---

[2] At trial, the medical examiner testified he conducted a sexual assault exam on Berber's body and found no signs of sexual assault. Linderman argues in his appellate brief that he and Berber had a consensual sexual relationship, but we have no information in the record to confirm or refute this claim.

the same vehicle heading westbound back toward Berber's home. Investigators later discovered Linderman drove a white Buick sedan, which appeared to match the vehicle recorded by the surveillance camera.

Having identified Linderman as a suspect following the DNA match, Special Agent Schnitker traveled to Charles City on July 5, 2017, and interviewed Linderman at his place of employment. Linderman stated he had previously lived in Newton with his wife for approximately one year. Special Agent Schnitker asked about friends and acquaintances in the Newton area, and Linderman volunteered he knew Berber from cutting trees at his property. Special Agent Schnitker had not mentioned Berber or the investigation before Linderman's reference to Berber. When pressed on the nature of his relationship with Berber, Linderman first said Berber was "kind of a friend" and he had only met him a few times. He also acted as if he was not sure Jose was Berber's "real" first name and called Berber "that Mexican guy." But Linderman changed his story later in the interview and admitted he had been to Berber's house dozens of times and had even met his mother four times.

Investigators knew Linderman was "in the area" on March 1 following a stint in jail, five days before Berber's body was discovered. So Special Agent Schnitker questioned Linderman about his whereabouts during that time frame and whether he had seen Berber before the discovery of the body on March 6. Linderman first responded he could not remember if he saw Berber and that he did not think he had before stating that he "might have" seen Berber during the time frame. He also stated that if he had seen Berber it would have been at Berber's home and he

would have shown up unannounced. Linderman further volunteered that he learned of Berber's death shortly after returning to the Newton area.

Believing they might be helpful, Special Agent Schnitker obtained Linderman's March 2017 cell phone records.[3] Through these records, he could determine tower 460, the closest cell tower to Berber's home, connected several incoming and outgoing phone calls from Linderman's phone on March 6. Special Agent Schnitker used specialized software to narrow down which 120 degree sector of tower 460 connected Linderman's calls on March 6. At 9:46 a.m. tower 460 connected an incoming call from Linderman's wife in the 120 degree sector where Berber's home was located. At 10:50 a.m. Linderman made an outgoing call, which connected through the same 120 degree sector. At 12:19 p.m. Linderman received another call from his wife that connected through tower 461, which was further from Berber's home, but the 120 degree sector still included Berber's home. Linderman's wife called again at 12:20 p.m., this call connected through tower 460 in the same 120 degree sector including Berber's home. After these four calls, the next calls on Linderman's phone were consistent with him driving north along Highway 14 toward his home in Allison.

On July 21, 2017, Linderman was charged with first-degree murder; the State alleged "on or about March 6, 2017 in Jasper County, Iowa, the defendant, having malice aforethought, did willfully, deliberately, and with premeditation kill Jose Ramirez Berber." Linderman pled not guilty.

---

[3] Investigators knew Linderman had his cell phone on March 6—a person familiar with Linderman spoke to him on his cell phone that afternoon.

Trial began on November 5, 2018. During voir dire, Linderman challenged prospective juror A[4] for cause following an exchange with defense counsel. Juror A knew and attended church with Sheriff Halferty "for almost [his] whole life." Defense counsel asked if the prospective juror could remain open minded if the defense criticized Sheriff Halferty's work on the case during cross-examination. He responded, "I think so. I mean, you know, saying you can do it and actually being able to do it are two different things, but, you know, I think so." Defense counsel continued to probe the prospective juror:

> Q. Okay. So do you think, as you consider it in your head, that you can alleviate all of my concerns and be fair and impartial; or do you have a concern that perhaps if you are selected for this case and hear from Sheriff Halferty and you say, "Sheriff Halferty could have done a better job"—are you going to be able to be a fair and impartial juror? A. Well, I don't know. Is "no" an answer? . . . I mean, I don't know. Obviously better safe than sorry, so I think I'd say no.
> . . . .
> Q. But if you hear from Sheriff Halferty and you, in the face of your personal relationship with him, don't believe you can step aside in looking at all of the evidence, that's something we all want to know. So in light of all that, do you think this is the best case for you to serve as a juror on? A. I would say no.

Linderman then asked the court to dismiss prospective juror A for cause. Before ruling, the court also questioned the juror:

> Q. Sir, have you formed or expressed any opinion about this case at this point? Do you have an opinion about this case?
> A. Oh no.
> Q. Okay. Are you willing to follow the court's instructions and decide this evidence—this case on the evidence presented?
> A. Yeah.[5]

---

[4] There are references to two potential jurors called for jury duty here. We call the prospective juror "juror A" and the alternate juror "juror B."

[5] In our imperfect but preferred jury system, trial judges, who are in a position of authority, often try to rehabilitate a prospective juror. To do this, the judges ask the prospective juror if she or he can follow the instructions (which they have not yet seen) and decide the case on the evidence presented (evidence they have not

The district court, satisfied the prospective juror could remain fair and impartial, overruled Linderman's challenge.

Linderman exercised a peremptory strike to disqualify juror A and maintained juror A should have been struck for cause. After the parties exercised their peremptory strikes, but before the jury members were announced, Linderman asked the court to grant an additional peremptory strike as a remedy for rejecting his challenge for cause over juror A. Linderman identified juror B as a person he would strike if allowed an additional peremptory strike.[6] The court denied his request. Ultimately, juror B, drawn as an alternate at the end of the trial, was excused after the record closed. Juror B did not deliberate.

After the close of the State's case, Linderman moved for judgment of acquittal, and he renewed his motion after all evidence was presented. The district court denied both motions. On November 14, the jury found Linderman guilty of murder in the first degree. Linderman next moved to continue sentencing and extend the post-trial motion deadlines, citing newly discovered evidence. In March 2019, Linderman moved for a new trial, again citing newly discovered evidence, while also claiming the jury verdict was contrary to the weight of the evidence.

---

yet heard). There are differences of opinion about whether it exposes the juror's true biases. *See* Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 160 (2010) ("[E]mpirical research suggests that potential jurors respond more candidly and are less likely to give socially desirable answers to questions from lawyers than from judges. As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can "'be fair.'").

[6] Linderman also suggested there were two or three others he might strike without identifying any specific juror.

After a contested hearing in August 2019, the court denied Linderman's motion for a new trial and entered judgment. Linderman timely appealed both the guilty verdict and the denial of his motion for a new trial.

**II. Error Preservation and Standard of Review.**

The State concedes Linderman preserved error on each of his claims. As to Linderman's first claim that the court erred in declining to strike juror A for cause: "We review the district court's rulings on challenges to potential jurors for cause for abuse of discretion." *State v. Jonas*, 904 N.W.2d 566, 571 (Iowa 2017). "The district court is vested with broad discretion in such rulings." *Id.*

Linderman's second claim alleges the court erred in denying his motions for judgment of acquittal, arguing there was insufficient evidence to find him guilty of first-degree murder. "We review challenges to the sufficiency of [the] evidence for correction of errors at law." *State v. Albright*, 925 N.W.2d 144, 150 (Iowa 2019).

Linderman's final claim asserts the court abused its discretion in denying his motion for a new trial on the basis the verdict was contrary to the weight of the evidence and newly discovered evidence justified remanding for a new trial. We review a district court's denial of a motion for new trial for abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). "Trial courts have broad discretion in passing on motions for new trial." *State v. Atley*, 564 N.W.2d 817, 821 (Iowa 1997). Abuse of discretion occurs if the district court "exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (internal quotation marks and citation omitted). "On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight

of the evidence." *Reeves*, 670 N.W.2d at 203. "[W]e review the trial court's ruling on a motion for new trial on the basis of newly-discovered evidence for an abuse of discretion." *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996) (citation omitted).

**III. Analysis.**

**A. Did the Court Commit Reversible Error in Denying Linderman's Motion to Strike a Juror for Cause and Denying His Request for an Additional Peremptory Strike?**

Iowa Rule of Criminal Procedure 2.18(5)(k) provides a juror may be challenged for cause if the juror has "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." In determining whether a challenge for cause should be granted, the test is "whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant." *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985). Linderman urges the district court erred by refusing to strike juror A for cause. He contends the error requires remand for a new trial, thus, he must show (1) the court abused its discretion in refusing to strike prospective juror A and (2) prejudice resulted. *See Jonas*, 904 N.W.2d at 575, 583; *see also State v. King*, No. 17-0063, 2018 WL 1865107, at *3–4 (Iowa Ct. App. Apr. 18, 2018).

Linderman argues the district court's abuse of discretion in refusing to strike the potential juror was prejudicial because it caused him to expend a peremptory strike to remove that juror. That prejudice was discussed in *State v. Neuendorf*:

[P]artiality of a juror may not be made the basis for reversal in instances in which that juror has been removed through exercise of a peremptory challenge. . . . Prejudice will [not] be presumed from the fact that the defendant has been forced to waste a peremptory challenge.

509 N.W.2d 743, 747 (Iowa 1993). The court later modified its approach in *Jonas*:

[T]o show prejudice when the district court improperly refuses to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted. Where the defendant makes such a showing, prejudice will be presumed.

. . . .

Under our approach, *Neuendorf* remains good law where a judge improperly denies a challenge for cause but the defendant does not specifically ask for an additional peremptory challenge of a particular juror after exhausting his peremptory challenges under the rule. When a defendant identifies a particular juror for an additional peremptory challenge and the district court denies the additional peremptory challenge . . . the defendant is in precisely the same position as the defendant in *Mootz*,[7] namely a *juror is actually seated who should have been subject to a peremptory challenge. In this setting, reversal is required.*

904 N.W.2d at 583 (emphasis added) (footnote and citation omitted). Linderman complied with the three prongs in *Jonas*—(1) he moved to strike juror A for cause, which the court denied; (2) he requested the court grant an additional peremptory strike; and (3) he identified a separate juror he would have used the peremptory strike on had the court dismissed prospective juror A for cause. So if the district

---

[7] In *State v. Mootz,* 808 N.W.2d 207, 225 (Iowa 2012), the court stated:
Denying the free exercise of peremptory challenges . . . forces the defendant to be judged by a jury that includes a juror objectionable to him. When this occurs, and the defendant properly objected to the juror by attempting to use a peremptory challenge, and that objection is wrongfully overruled, we will presume the error is prejudicial.
The *Mootz* court concluded the district court erroneously prevented Mootz from using one of his peremptory strikes on a juror he found objectionable. *Id.* at 226.

court abused its discretion in denying the challenge for cause to juror A, then prejudice is presumed.[8]  *See id.* at 583.

We find the district court did not abuse its discretion in denying the challenge for cause as to juror A.  In the colloquy with juror A, Linderman developed a potential tension for the prospective juror to test whether the juror could impartially evaluate Sheriff Halferty's testimony.  And the prospective juror admitted that if the sheriff's job performance was questioned it would not be "the best case for [juror A] to serve as a juror on."  But unlike the prospective juror in *Neuendorf*, where the juror believed the defendant was equally as guilty as the defendant in the other case she knew about and never moved from that position, this juror offered no opinions on the guilt or innocence of Linderman.  *See* 509 N.W.2d at 745–46.  Thus, Linderman used a peremptory strike to remove juror A. *See State v. Hunter*, 92 N.W. 872, 874 (Iowa 1902) (instructing that one purpose of a peremptory challenge is to serve as a safeguard against an unjust conviction); s*ee also Jonas*, 904 N.W.2d at 585 (Waterman, J., concurring specially) (noting juror comments, such as the parties would "do better" with a different juror, trigger appropriately the use of a peremptory strike but are not enough to mandate an excuse for cause).  In any event, we also note that Sheriff Halferty's competence

---

[8] This case presents a new wrinkle.  Here, different from *Mootz*, the juror Linderman would have dismissed with an additional peremptory strike, juror B, was excused before the jury retired for deliberations.  808 N.W.2d at 225.  Juror B was not a "juror actually seated who should have been subject to a peremptory challenge."  *Jonas*, 904 N.W.2d at 583.  So, if the district court abused its discretion, which prejudice test applies to these facts—*Mootz* (presumed prejudice) or *Neuendorf* (actual prejudice)? This is a question for another day.

was not questioned during the trial and his testimony was short, mainly focused on his description of the murder scene supported by photographs.

We find no abuse of discretion in the denial of the challenge for cause of juror A. Accordingly, we decline to remand for a new trial over this claim.

**B. Did Substantial Evidence Support the Jury's Guilty Verdict?**

Linderman contends the court erred in denying his motions for judgment of acquittal, arguing the State presented insufficient evidence for the jury to find him guilty of first-degree murder beyond a reasonable doubt. Specifically, Linderman urges the State presented "little evidence [he] committed the acts that led to the death of Mr. Ramirez-Berber." He starts with the dynamics of Berber's physical injuries. Linderman suggests the evidence showed Berber's injuries "were the result of a single application of pressure that could've been caused by an accidental fall." He also argues the State did not prove beyond a reasonable doubt Linderman acted with malice aforethought, willfulness, premeditation, or deliberation, while maintaining there is "no evidence he committed the acts leading to the death of Mr. Ramirez-Berber."

"In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016) (citation omitted). "A jury verdict finding of guilt will not be disturbed if there is substantial evidence to support the finding." *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). Evidence is substantial if it would "convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted).

Even without direct evidence showing how the crime occurred, circumstantial evidence linking Linderman to the murder was substantial. *See State v. Huser*, 894 N.W.2d 472, 491 (Iowa 2017) (noting direct and circumstantial evidence are equally probative). Instead of being over an hour away at his home or work, Linderman's cell phone records show he was in the area around Berber's home on March 6, the day Berber's body was discovered. Footage from the neighbor's surveillance camera showed a vehicle matching Linderman's vehicle heading to and from Berber's home on the same day. Linderman's DNA was discovered in Berber's underwear and rectum in the form of sperm and seminal fluid. And Linderman was evasive and dishonest when interviewed by law enforcement about his relationship with Berber, trying to distance himself from Berber, before revealing he had been to his home dozens of times. *See State v. Ernst*, ___N.W.2d ____, ____, 2021 WL 297250, at *4 (Iowa 2021) (finding inferences from circumstantial evidence including defendant's car in the area on video footage, along with false story of defendant supported substantial evidence of attempted burglary conviction). In his brief, Linderman identified various hypothetical scenarios of how Berber may have died, but each example centers on a single fall or single application of force. "The jury is not required to accept the defendant's version of the events." *State v. Helm*, 504 N.W.2d 142, 146 (Iowa Ct. App. 1996); *accord State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." (alteration in original) (citation omitted)). Ample evidence supports the jury verdict finding Linderman murdered Berber beyond a reasonable doubt.

But even so, Linderman disputes the evidence shows he had malice aforethought. He argues the State failed to prove the elements of first-degree murder beyond a reasonable doubt.[9] Our supreme court has acknowledged, "[I]t is often impossible for a jury to determine a defendant's state of mind without the aid of inference." *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017) (citation omitted). Thus, "[p]roof of the requisite intent or malice aforethought may be accomplished by inferences made from the acts and conduct of the defendant and the means used in doing the wrongful and injurious acts." *State v. Wedebrand*, 602 N.W.2d 186, 189 (Iowa Ct. App. 1999). "It is presumed a person intends the natural consequences of his intentional acts." *State v. Ochoa*, 244 N.W.2d 773, 777 (Iowa 1976).

Turning to the premeditation element of the claim, Linderman argues that a single application of force killed Berber. By contrast, the medical examiner who

---

[9] Jury instruction 19 required the State to prove the following beyond a reasonable doubt:

    1. On or about the 6th day of March 2017, the defendant struck Jose Ramirez Berber about the head and face.
    2. Jose Ramirez Berber died as a result of being struck about the head and face.
    3. The defendant acted with malice aforethought.
    4. The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Jose Ramirez Berber.

Jury instructions 20 and 22 defined the elements of first-degree murder as follows:

    "Willful" means intentional or by fixed design and purpose and not accidental.
    "To deliberate" is to weigh in one's mind, to consider, to contemplate, or to reflect.
    "Premeditate" is to think or ponder upon a matter before acting.
    "Malice aforethought" is a fixed purpose or design to do some physical harm to another that exists before the act is committed. It does not have to exist for any particular length of time.

performed the autopsy testified Berber's injuries resulted from multiple applications of blunt-force trauma, possibly inflicted by a knee, fist, or elbow. When asked whether the injuries to Berber's brain could result from a fall, the medical examiner said it was "possible" but clarified it was "unlikely" the injuries could have been caused by a fall from a standing position onto a carpeted floor.[10] According to the medical examiner's testimony, "[T]he injuries are consistent with a fall, but a fall from great height with some velocity. In this particular individual there are injuries on both sides of the head, so that mitigates against a single fall."

Deliberation and premeditation may be shown by circumstantial evidence in one of three ways: "(1) evidence of planning activity . . . ; (2) evidence of motive which might be inferred from prior relationships between defendant and the victim; and (3) evidence regarding the nature of the killing." *State v. Harrington*, 284 N.W.2d 244, 247–48 (Iowa 1979). Here there is no evidence of planning activity. But the State points to evidence of motive developed in the trial. First, the State suggested Linderman might have killed Berber to hide their sexual relationship from his wife.[11] Second, the State described a financial disagreement between Linderman and Berber over a log-cutting transaction as a possible motive for the killing.

As the primary support for a finding of premeditation, the State emphasizes the severity of the beating inflicted on Berber. The State argues a jury could infer

---

[10] Berber's body was found lying on a carpeted area of his home.
[11] Linderman wrote a letter to his wife from jail following his arrest claiming he was not in the Newton area at the time of Berber's death. His cell phone records contradict this, and the State suggested at trial that Linderman was attempting to hide this information from his wife.

the necessary mens rea elements of first-degree murder from the nature of the killing. We agree. As discussed, expert testimony from the medical examiner established Berber was killed by multiple applications of blunt-force trauma to his head and face.[12] A beating of that nature requires inflicting injury over and over such that a jury could infer deliberation and thoughtfulness with each blow. *See State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981) ("Multiple [stab] wounds refute any suggestion of inadvertence or mistake and supply strong evidence of malice and intent to kill."); *see also State v. Buenaventura*, 660 N.W.2d 38, 48 (Iowa 2003) (providing that premeditate means "to think or ponder upon the matter before acting"). A jury, finding Linderman was the assailant, could infer he killed Berber willfully with malice aforethought based on Beber's injuries, which were caused by multiple applications of severe blunt-force trauma to the head. In other words, death was a natural consequence of the severe beating the jury found Linderman inflicted on Berber. *See State v. Rhode*, 503 N.W.2d 27, 39 (Iowa Ct. App. 1993) (finding malice aforethought could be inferred when the defendant slammed the victim's head against a hard surface causing a severe head injury). We now turn to the elements of deliberation and premeditation.

We find the jury could have reasonably concluded from the evidence Linderman had "sufficient opportunity to weigh in his mind, contemplate, and consider the consequences" of striking Berber over and over about the head and face. *See Helm*, 504 N.W.2d at 146 ("[P]remeditation need not exist for any

---

[12] Multiple applications of blunt-force trauma to Berber's head and face caused multiple skull fractures and subarachnoid hemorrhaging across almost the entire surface of his brain.

particular length of time."). And the State does not have to prove the fixed purpose to do harm existed for any particular length of time. *See State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010) (finding malice aforethought requires such deliberation to appreciate and understand the probable consequences of the design to do harm as distinguished from a crime done in the heat of passion).

Based on this reasoning, we find the evidence, viewed in the light most favorable to the State, was sufficient to establish the elements of first-degree murder beyond a reasonable doubt.

**C. Did the Court Err in Denying Linderman's Motion for a New Trial?**

We last examine Linderman's theories for granting a new trial: (1) verdict contrary to the weight of the evidence and (2) newly discovered evidence. "Iowa Rule of Criminal Procedure 2.24(2)(b)(6) permits a district court to grant a motion for new trial when a verdict is contrary to the weight of the evidence." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Id.* (citation omitted). The analysis is broader than the sufficiency-of-the-evidence analysis "in that it involves questions of credibility and refers to a determination that more credible evidence supports one side than the other." *State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006). Yet it is "also more stringent than the sufficiency of the evidence standard in that it allows the court to grant a motion for new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered." *Ary*, 877 N.W.2d at 706. "[A] district court may invoke its power to grant a new trial on the ground the verdict

was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.*

To support the theory that the verdict was against the weight of the evidence, Linderman reasserts "the identical factual argument" he made in his sufficiency-of-the-evidence claim. Under similar reasoning as found above, we conclude the district court did not abuse its broad discretion in denying Linderman's motion for a new trial. The court could reasonably find the greater amount of credible evidence supports the jury's conclusion that Linderman, having malice aforethought, did willfully, deliberately, and with premeditation kill Berber. This is not an "extraordinary case where the evidence preponderates heavily against the verdict." *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

As for the final theory concerning whether the district court abused its discretion in denying Linderman's motion for new trial based on newly discovered evidence, we are unpersuaded. At its core, the argument is that evidence implicates another killer, K.W.[13] Iowa Rule of Criminal Procedure 2.24(2)(b)(8) states a new trial may be granted "[w]hen the defendant has discovered important and material evidence in the defendant's favor since the verdict, which the defendant could not with reasonable diligence have discovered and produced at the trial." We note the district court has "'[u]nusually broad discretion' when 'ruling on a motion for new trial on the basis of newly discovered evidence." *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020) (alteration in original) (quoting *State v. Miles*, 490 N.W.2d 798, 799 (Iowa 1992)). "[W]e have made it clear that the court

---

[13] The affiant provides a full name for K.W. But as to all individuals named in the affidavits, we choose to refer to each by their initials.

should closely scrutinize them and grant them sparingly." *State v. Carter*, 480 N.W.2d 850, 852 (Iowa 1992) (citation omitted). A motion for new trial based on newly discovered evidence should be granted only if the evidence "(1) was discovered *after* the verdict, (2) could not have been discovered earlier in the exercise of due diligence, (3) is material to the issues in the case and not merely cumulative, and (4) probably would have changed the result of the trial." *State v. Smith*, 573 N.W.2d 14, 21 (Iowa 1997) (quoting *State v. Jefferson*, 545 N.W.2d 248, 249 (Iowa 1996)).

Linderman's newly discovered evidence is in the form of five affidavits. So we treat each one separately. The first affiant points to an individual, K.W., who allegedly offered to "take care" of some people "like I did the Mexican." This affiant never mentions Berber by name.

The second affiant claims to have overheard Linderman talking to an individual named C.M. in the yard of the Jasper County Jail. The affiant states C.M. told Linderman he drove K.W. to Berber's house and C.M. knew K.W. killed Berber. The affiant states he later overheard C.M. tell Linderman he was not the driver, rather Berber's landlord or "another male" drove K.W. to Berber's house. This affidavit is contradictory about who allegedly drove K.W. to Berber's home. And before Linderman's trial, law enforcement interviewed C.M. during the investigation, prepared a report suggesting C.M. was in the area of Berber's home, and shared this report with Linderman. Thus, C.M.'s potential involvement was not evidence discovered "after the verdict" and could have been pursued earlier in the exercise of due diligence. *See State v. Compiano*, 154 N.W.2d 845, 850 (Iowa

1967) (requiring a defendant to show "that a reasonable effort was made" (citation omitted)).

The third affiant states he believes K.W. is responsible "in some way" for three deaths in Newton, including Berber's. The affiant offers no specific facts linking K.W. to Berber's murder.

The fourth affiant said he was in a known drug house with K.W. shortly after Berber's murder, and K.W. told him he was caught stealing meat from a garage and hit a man over the head to get away. The affiant also offers K.W. said he "committed the crime" with help from his brother-in-law. This affiant did not mention Berber by name. This theory of Berber's murder does not track the details of Berber's death. Berber's body was found in his home, and his garage was detached from the home. There was no evidence of any encounter or struggle in the garage.

The final affiant said most of what he knew about the case came from talking to Linderman while they were both in the Jasper County Jail, reading Linderman's paperwork, or "from talk on the streets." This affiant states C.M. drove K.W. to Berber's home the day of the murder on the behalf of Berber's landlord to collect rent money and K.W. killed Berber. The affiant also claims Linderman admitted he was at Berber's home the day of the murder, had sex with Berber, and left before 8:30 a.m. This contradicts Linderman's repeated assertions he was never at Berber's home on March 6. Further, the affiant has no firsthand knowledge of the events leading up to Berber's death. His assertions are based solely on secondhand information.

In denying Linderman's motion for new trial, the district court stated,

> [T]he court believes that [the] evidence presented is mostly hearsay, is certainly contradictory, and a lot of it was available to the defendant . . . before trial. The court also notes . . . that these were arguments . . . made by counsel for Mr. Linderman at trial.

We agree. The district court "is generally in a better position than we to determine whether evidence, newly discovered, would probably lead to a different verdict upon retrial." *Id.* at 849. The information in the five affidavits is largely hearsay[14] or evidence available to Linderman before the verdict. Likewise, Linderman fails to explain why the pretrial investigator could not have discovered this "new" information gathered by the post-trial investigator. The State investigated over forty witnesses, some of whom were named in the affidavits. The details in the affidavits are unreliable because of contradictory information within and between the affidavits. And the affidavits dispute facts proved by more reliable sources at trial.

What is more, the State exposed the lack of trustworthiness of the affiants with a recording of a jailhouse call between the third affiant and a friend referencing a $10,000 payment for helping Linderman and with a note from C.M., filed with the district court, denying he ever drove K.W. to Berber's home. As a result, Linderman failed to show any of the information in the affidavits was likely to change the result of the trial. Or, stated another way, even if this conflicting information were used at trial, the jury could still find Linderman guilty based solely on the evidence available at trial. *See Moon v. State*, 911 N.W.2d 137, 151 (Iowa 2018).

---

[14] None of the five affiants or any person identified in the affidavits as having new information testified at the hearing on the new-trial motion.

Thus, we find the district court did not abuse its discretion in denying Linderman's motion for new trial based on these affidavits.

**IV. Conclusion.**

We affirm Linderman's conviction of first-degree murder. We find no abuse of discretion in the denial of the challenge for cause of juror A. The verdict was supported by substantial evidence and was not contrary to the weight of the evidence presented. Lastly, the newly presented evidence does not justify granting Linderman a new trial.

**AFFIRMED.**