# IN THE COURT OF APPEALS OF IOWA

No. 21-1391
Filed November 2, 2022

**EURIC ABRAY FOUNTAIN,**
 Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
 Respondent-Appellee.
_____

 Appeal from the Iowa District Court for Polk County, Samantha Gronewald,

Judge.

 Euric Fountain appeals the denial of his eighth application for postconviction

relief. **AFFIRMED.**

 Erica A. Nichols Cook and Elaina Steenson of State Public Defender's

Office, Des Moines, for appellant.

 Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant Attorney

General, for appellee.

 Heard by Bower, C.J., Badding, J., and Potterfield, S.J.*

 *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**BADDING, Judge.**

Since a jury found him guilty of first-degree murder thirty-four years ago, Euric Fountain has maintained his innocence in a series of proceedings challenging his conviction. Fountain had some partial success on appeal from his most recent postconviction-relief challenge. In that appeal, we concluded the district court erred in granting the State's motion for summary disposition under Iowa Code section 822.3 (2017) as to two witnesses who authored affidavits recanting their trial testimony because the court applied the newly-discovered-evidence test instead of the new-ground-of-fact test. *See Fountain v. State*, No. 17-2024, 2019 WL 5424928, at *4 (Iowa Ct. App. Oct. 23, 2019).

On remand, the district court skipped the question of whether the affidavits satisfied the ground-of-fact exception to the three-year time bar in section 822.3 and instead dismissed the application on its merits, concluding Fountain could not meet his burden under the newly-discovered-evidence test. Fountain appeals, claiming the court erred in failing to address the statute-of-limitations question before reaching the merits. He asks us to decide that issue in his favor and remand "for trial to determine if the claim of new material evidence is sufficient to probably change the result of the trial under Iowa Code § 822.2(1)(d)."

## I.     Background Facts and Proceedings

The background of Fountain's eighth application for postconviction relief was summarized in the prior appellate decision as follows:

> Fountain and two other men, William Ridley and Will Howard, were charged with first-degree murder in relation to the 1987 death of Theodore Wilt. A jury found Fountain guilty of first-degree murder, Howard was separately convicted, and Ridley pled guilty to a charge

of second-degree murder. This court affirmed Fountain's conviction on direct appeal. Procedendo issued in 1990.

In 1996, Howard sent the attorney representing Fountain in the appeal of the denial of his first [postconviction-relief] application a letter, in which Howard stated his willingness to testify, under oath, that Fountain was not involved in Wilt's death. Also in 1996, Fountain filed his second [postconviction-relief] application, citing Howard's purported testimony as newly discovered evidence. In 1997, the attorney representing Fountain in relation to his second [postconviction-relief] application wrote a letter asking Fountain whether he wanted to pursue a new trial upon Howard's statements, which "completely vindicates [Fountain] and indicates [he was] not even a participant in the murder." The attorney advised he did not believe Howard's testimony, alone, would result in a new trial for Fountain. The attorney also advised if he pursued a new trial using Howard's testimony, there was a possibility he could not use it in conjunction with other new evidence uncovered in the future. Fountain agreed to not pursue a new trial upon Howard's testimony, and the second application was ultimately dismissed for failure to prosecute.

At the murder trial in 1988, Dennis Daggett testified Ridley came to his residence and reported he and his cousin Euric had killed someone. Blanch[e] Carr testified she saw Fountain, Howard, and Ridley at a bar she worked at the evening of the murder. She further testified at around 8:00 p.m., the three left the bar together. Carr testified the three returned to the bar together around midnight. While speaking with Howard thereafter, Carr observed dark spots on Howard's clothing that he reported was blood, and Howard indicated to her that they had killed someone. Carr also observed a blood smear on Howard's palm. Ridley and Fountain left the bar together about thirty or forty-five minutes after their return. Ridley unequivocally testified that he, Howard, and Fountain were involved in the murder. Ridley's remaining trial testimony was generally in line with that of Carr and Daggett.

In 2015, Carr and Daggett authored affidavits in which they recanted some of their testimony. Daggett's affidavit is somewhat illegible, but he appears to have asserted he was coached to tell police and later testify Fountain was involved in the murder. Carr recanted her testimony that Fountain left the bar with Ridley and Howard prior to the murder. However, she did state she later observed the three return to the bar together. She also recanted her testimony that Howard told her about a murder and that she observed blood on him. Howard also authored an affidavit in which he again stated Fountain was not involved in Wilt's death.

In 2017, Fountain filed the instant [postconviction-relief] application in which he argued new evidence of material facts require vacation of his conviction. In a subsequent brief, he argued the

alleged new evidence supported a claim of actual innocence. The
State moved for summary disposition on statute-of-limitations
grounds. The court granted the motion, concluding the information
from Howard was not newly discovered and the 2015 affidavits were
not credible.

*Id.* at *1–2 (footnotes omitted).[1]

Although not mentioned in our prior opinion, the State's motion for summary

disposition also asserted that Fountain's newly-discovered-evidence claim failed

on the merits, though its arguments on those separate issues were combined. In

resistance, Fountain asserted the ground-of-fact exception to section 822.3

applied and argued genuine issues of material fact existed on the merits of his

newly-discovered-evidence claim. Following the State's lead, the district court's

summary disposition ruling did not separately address the two issues. Instead, the

court cited section 822.3 and the newly-discovered-evidence test before

concluding that because Fountain had Howard's letter "for many years and chose

not to act upon it," that evidence was "not newly discovered." As for the affidavits

from Daggett and Carr, the court found neither recantation would have "resulted in

an acquittal."

In Fountain's appeal from that ruling, we framed the issue as whether "the

district court erred in concluding [his] application was barred by the three-year

statute of limitations." *Id.* at *1. We agreed the information from Howard "was not

newly discovered because Fountain knew of the information for many years and

chose not to act upon it." *Id.* at *2. So that evidence did "not serve to toll the

---

[1] Howard did not testify at Fountain's trial, although Ridley did.

statute of limitations" as a new ground of fact that could not have been raised within the applicable time period. *Id.*; *accord* Iowa Code § 822.3.

As "to the 2015 affidavits of recantation by Daggett and Carr stating that they provided false testimony upon being pressured by law enforcement and the prosecution," we found:

> The district court concluded, on the merits, that the affidavits lacked credibility and the recanted testimony generally had no effect on Fountain's murder trial. The court made no express finding as to whether the information contained in the affidavits amounted to grounds of fact that could not have been raised within the limitations period. *See* Iowa Code § 822.3. Instead, the court concluded on the merits that the evidence would not change the result if a new trial was granted, given the other evidence of guilt presented. Our supreme court has explicitly and specifically rejected any requirement that an applicant must show the ground of fact would likely or probably have changed the outcome of the underlying criminal case in order to avoid a limitations defense. Courts are not to reach the merits of a claim based on a new ground of fact in deciding whether the exception to the three-year statute of limitations applies. That is exactly what the district court did here, which we conclude was error.

*Id.* at *4 (cleaned up). We accordingly "reverse[d] the summary disposition ruling as to the 2015 affidavits," and remanded "the matter to the district court to properly determine whether the affidavits amount to newly discovered evidence and thereafter proceed in accordance with Iowa law." *Id.* (footnote omitted). In a footnote, we stated: "We take no position on whether the 2015 affidavits qualify as newly discovered evidence sufficient to toll the statute of limitations."

Following remand, a trial date was set with discovery deadlines. After the trial date was set, the district court set a hearing on the State's original motion for summary disposition. In the lead-up to that hearing, Fountain applied for and was granted funds for an investigator at the State's expense. He served multiple

subpoenas and secured several continuances of the hearing date so that he could complete his investigation before the summary disposition hearing date.

Once the hearing date arrived, Fountain's attorney laid out a narrow interpretation of our remand order, telling the court at the start of the hearing that "this is not a proceeding regarding the substantive claim of Mr. Fountain in regard to the credibility or the merit of the two affidavits." Instead, according to Fountain, the sole purpose of the hearing was to determine whether the affidavits met the ground-of-fact exception to section 822.3. The State, on the other hand, advocated for a broad interpretation, asserting the case was remanded "for the Court to make a determination of whether there was newly discovered evidence in this case." According to the State, "That's a substantive . . . claim. It's one that contains a number of elements, and if any of those elements is wholly absent from the undisputed record in this case, that's an appropriate basis for summary judgment." In response, Fountain asserted "that you have to determine statute of limitations time bar issue before you can get to merits."

After hearing Fountain's evidence,[2] the district court sided with the State's broad interpretation of our remand order. As a result, the court did not address the

---

[2] That evidence included Fountain's testimony that he was transferred to the Newton Correctional Facility in March 2014 where he stayed until August 2015. While there, he met fellow inmate Matthew Kauffman, who turned out to be Daggett's brother. "[A] couple days or so" later, Kauffman provided Fountain with affidavits written by both himself and Daggett. Although Daggett was also an inmate at the prison, Fountain never encountered him there. He did, however, meet Damiko Carr while at Newton, who Fountain learned is Blanche Carr's grandson. Fountain gave Damiko a copy of Carr's testimony. After reading it, Damiko told Fountain: "That's messed up. I'll contact my grandma and talk to her about it." About a week later, Damiko provided Fountain with an unsigned affidavit from Carr. Fountain sent a copy to his brother, Larry Quinn, who tracked down Carr in 2015 and had her sign it.

statute-of-limitations issue under section 822.3 at all, instead jumping directly to the merits of whether the 2015 affidavits amount to newly discovered evidence based on the following considerations: whether (1) the evidence was discovered after the verdict, (2) it could not have been discovered earlier in the exercise of due diligence, (3) it is material and not merely cumulative or impeaching, and (4) it would have changed the result of the trial. *See Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003) (citation omitted) (stating that in order to prevail on a newly-discovered-evidence claim, an applicant must prove those four elements).

The court found Fountain satisfied the first two elements. As to the third and fourth elements, the court found the differences between Daggett's testimony and his affidavit "have impeachment value only and," as such, "lack materiality in the context of a newly-discovered evidence claim." Considering "the entirety of the evidence presented at trial," the court also found "it cannot be said that the information contained within the affidavit would have probably changed the outcome of the trial." The court reached the same conclusions about Carr's affidavit. Finding Fountain did not meet his burden to establish his claim of newly discovered evidence, the court dismissed the application.

Fountain appeals. He argues the court applied the wrong legal standard in determining whether his application was excepted from the statute of limitations. He also argues summary disposition was improper because genuine issues of material fact remain and preclude the State's entitlement to judgment as a matter

---

Fountain's younger brother, Mark, later signed an affidavit in 2021 stating he knows Carr and learned she now has dementia or Alzheimer's. Carr's daughter submitted an affidavit stating the same. Other affidavits stated Daggett and Kauffman could not be located. And Damiko Carr is now deceased.

of law. Lastly, he argues the court "failed to analyze the effect of the new evidence on the evidence at trial," which seems to be a claim that the new evidence probably would have changed the result of the trial.

## II.     Analysis

### A.     Scope of Remand Ruling

At the outset, we must determine the scope of our remand mandate since that guides our resolution of the claims Fountain raises on appeal. *See In re Marriage of Davis*, 608 N.W.2d 766, 769 (Iowa 2000) ("When . . . an appellate court remands for a special purpose, the district court upon such remand is limited to do the special thing authorized by the appellate court in its opinion and nothing else."). Was the district court limited to deciding whether the affidavits met the ground-of-fact exception to the statute of limitations in section 822.3, as Fountain contends, or could the court adjudicate Fountain's newly-discovered-evidence claim on its merits, as the State asserted? To answer this question, we need to first clarify the two different tests lurking in the background on these separate issues.

Our postconviction-relief statute contains a three-year statute of limitations for filing postconviction relief applications, though the "limitation does not apply to a ground of fact or law that could not have been raised within the applicable time period." Iowa Code § 822.3. An applicant relying on the ground-of-fact exception must show: (1) "he or she could not have raised the ground of fact within the limitations period" and (2) "a *nexus* between the asserted ground of fact and the challenged conviction." *Moon v. State*, 911 N.W.2d 137, 143 (Iowa 2018) (citation omitted). The nexus requirement involves a showing that the ground of fact is relevant to the conviction, meaning "the ground of fact must be of the type that has

the *potential* to qualify as material evidence for purposes of a substantive claim under section 822.2." *Id.* (quoting *Harrington*, 659 N.W.2d at 521). In attempting to overcome the time-bar, an applicant does not need to "show the ground of fact would likely or probably have changed the outcome of the underlying criminal case." *Id.* (quoting *Harrington*, 659 N.W.2d at 521). That determination "must await an adjudication, whether in a summary proceeding or after trial, on the applicant's substantive claim for relief." *Id.* (quoting *Harrington*, 659 N.W.2d at 521).

When determining the merits of a newly-discovered-evidence claim, the court must consider the four-part test laid out by the district court in its summary disposition ruling. The first two elements focus on the timing of when the evidence was discovered, while the last two consider whether "the evidence is material to the issues in the case and not merely cumulative or impeaching" and whether "the evidence probably would have changed the result of the trial." *Id.* at 151. The court in *Harrington*, and then again in *Moon*, emphasized "the ground-of-fact exception pursuant to section 822.3 is not the same as a substantive claim for postconviction relief based on newly discovered evidence pursuant to section 822.2(1)(d)." *Id.* at 143. Fountain's argument kicks in here—he complains the district court did not properly conduct a nexus analysis but instead "erroneously conducted a merits analysis."

The problem with the district court's first ruling on the State's motion for summary disposition was that in deciding the ground-of-fact exception under section 822.3, the court "concluded on the merits that the evidence would not change the result if a new trial was granted." *Fountain*, 2019 WL 5424928, at *4.

We reversed on that ground because "[c]ourts are not to 'reach the merits of a claim based on a new ground of fact in deciding whether the exception to the three-year statute of limitations applies.'" *Id.* (citation omitted).

The district court on remand did not make that same error. Unlike the first time around, the court's remand ruling did not mention the statute of limitations or ground-of-fact exception in section 822.3. Instead, the court analyzed the State's alternate ground for summary disposition—that there were no genuine issues of material fact on the merits of Fountain's newly-discovered-evidence claim. This was permissible. *See, e.g.*, Brian R. Means, *Postconviction Remedies* § 25:3 (Aug. 2022 update) ("Generally, the question of whether a claim is timely is decided by the court before reaching the merits of the substantive federal claim . . . . Nevertheless, a district court is not required to rule on whether an asserted limitations defense applies if the habeas petition may be denied on simpler grounds." (footnotes omitted)).[3] And it fell within our remand mandate, which

---

[3] While our unpublished decisions could be read to mandate consideration of timeliness before consideration of the merits, that language tends to appear in decisions where the State wins on the timeliness issue and the district court's decision on the application of the statute of limitations is not tied to the merits analysis. *See, e.g.*, *Cole v. State*, No. 15-0344, 2016 WL 7395722, at *2 (Iowa Ct. App. Dec. 21, 2016); *Whiteside v. State*, No. 15-0534, 2016 WL 4051578, at *3 n.4 (Iowa Ct. App. July 27, 2016); *Zaabel v. State*, No. 15-0220, 2016 WL 4035236, at *5 (Iowa Ct. App. July 27, 2016). But such a reading would not be an entirely accurate interpretation of chapter 822. While the statute of limitations is often raised in a motion for summary disposition, chapter 822 provides two separate avenues for early determination, one by dismissal based on the statute of limitations in section 822.3, and one by summary disposition on the merits without a trial when one party is entitled to judgment as a matter of law in section 822.6. *See, e.g.*, *Anderson v. State*, No. 16-0394, 2016 WL 7393900, at *2 (Iowa Ct. App. Dec. 21, 2016). Here, the State raised both avenues. While it is true that it normally makes more sense to consider timeliness first, it is not required. Even if it was, the district court here issued findings tantamount to concluding Fountain survived the time-bar.

directed the court "to properly determine whether the affidavits amount to newly discovered evidence and *thereafter proceed in accordance with Iowa law.*"[4] *Fountain*, 2019 WL 5424928, at *4 (emphasis added) (footnote omitted).

That the district court on remand did not first engage in a nexus analysis before proceeding to the merits is of no consequence because a consideration of the merits would logically follow a conclusion that Fountain established the nexus requirement and overcame the time-bar of section 822.3. *See Moon*, 911 N.W.2d at 144–45, 151–53 (proceeding to a merits analysis of newly-discovered-evidence claim after concluding "the alleged exculpatory evidence has the potential to qualify as material evidence"); *Harrington*, 659 N.W.2d at 521 ("Because Harrington asserted a relevant ground of fact or law 'that could not have been raised within the applicable time period,' this action is not time barred. The district court erred in making a contrary ruling. That brings us to the merits of Harrington's application for postconviction relief." (citation omitted)).

Even if the failure to complete the nexus analysis was error, "[n]o error requires reversal absent the showing of prejudice." *Daniels v. State*, No. 01-0296, 2002 WL 100600, at *2 (Iowa Ct. App. Jan. 28, 2002). Fountain's argument on this point appears to be that the ground-of-fact test is all that he had to meet to

---

[4] We recognize that some confusion may have been generated by our generic use of the phrase "newly discovered evidence" in this remand mandate and accompanying footnote. But when the mandate is considered within the context of the proceedings, it is clear the district court was to reconsider the State's motion for summary disposition using the correct tests. *See Davis*, 608 N.W.2d at 769 ("The court on remand should interpret the mandate in 'accordance with the context of the proceedings' and should 'tak[e] into account the appellate court's opinion and the circumstances it embraces.'" (alteration in original) (citation omitted)).

survive summary disposition and proceed to a full-blown trial on the merits. But *Moon* and *Harrington* don't go that far; they only say that the ground-of-fact test is all that is required to avoid summary disposition *based on a limitations defense*. Both recognized that a determination of whether evidence is newly discovered under section 822.2(1)(d) can be made "in a summary proceeding," with the court in *Moon* affirming summary disposition on the merits of the claim. *Moon*, 911 N.W.2d at 143; *Harrington*, 659 N.W.2d at 521. While Fountain suggests he had a right to engage in discovery after overcoming the time-bar hurdle, he was given that opportunity before the summary disposition hearing. The trial scheduling order entered after remand set discovery deadlines. Fountain applied for and was granted an investigator at the State's expense. He secured several continuances of the summary disposition hearing so that he could engage in further investigation. And he served multiple subpoenas to aid in the development of his claim.

For these reasons, we conclude that any error in the court's failure to address the nexus requirement of section 822.3 did not prejudice Fountain, so reversal is not required.

### B. Merits

Next, Fountain argues the court erred in dismissing his application because it "applied the incorrect analysis and held that the newly discovered evidence was not material." He adds "dismissal is improper because material facts are in dispute" and "the district court failed to analyze the effect of the new evidence on the evidence at trial." Distilled down, Fountain claims the 2015 affidavits from Daggett and Carr recanting their trial testimony create genuine issues of material fact as to what really happened to Theodore Wilt.

Summary disposition may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Moon*, 911 N.W.2 at 142 (alterations in original) (quoting Iowa R. Civ. P. 1.981(3)). The record is viewed in the light most favorable to the nonmoving party, and the court draws all legitimate inferences in the party's favor. *Id.*

### 1. Newly discovered evidence

With that summary disposition standard in mind, to prevail on his newly-discovered-evidence claim, Fountain must show by a preponderance of the evidence:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*Id.* at 151 (quoting *Jones v. State*, 479 N.W.2d 265, 274 (Iowa 1991)).

The district court found Fountain satisfied the first two elements but not the third and fourth elements. In challenging the latter conclusion, Fountain claims that the "court failed to analyze the effect of the new evidence on the evidence at trial." We disagree and reach the same conclusion as the district court on our survey of the trial evidence in comparison to the new evidence.

### a. Trial Evidence

The trial transcripts show the following. Wilt lived in the basement of a home with four other apartments. A cellar door or hatch led to a flight of stairs, which in turn led to the entry door to Wilt's basement residence. Wilt's boss called him the

morning of Saturday, October 10, 1987, around 5:00 or 5:30 a.m. when he did not show up for work. After making several calls to him throughout the day, she went to his residence around 5:00 or 5:30 p.m. Once there, she found "a man laying in the doorway that was all bloody." She went home and called the police.

When Sergeant Larry Edwards arrived and viewed the scene, he observed bloody footprints on the concrete steps down to Wilt's basement apartment. There was no sign of forced entry, but the room containing Wilt's person was in a "state of disarray," containing "some bricks lying on the floor" that "appeared to be very bloody" and "[n]umerous footprints and tracks in the blood." Edwards opined Wilt suffered a "severe beating" about the head. After being notified, Wilt's sister went to the apartment and noticed a portable television and telephone answering machine were missing.

State Medical Examiner Dr. Thomas Bennett visited the crime scene and conducted the autopsy. He concluded Wilt's time of death to be around midnight, with the cause of death being pre-mortum severe head injuries, at least six blows, by beating with a heavy blunt instrument consistent with a brick or bricks. Dr. Bennett also observed an imprint from footwear on Wilt's chest.

At the time of the murder, Daggett was living with his girlfriend, Darla Ogg, and her adoptive grandfather, Clarence White. White testified that, around the time of the murder, Ridley came to the home and tried to sell him a television. White asked if it was stolen and, when Ridley did not respond, White declined. White recalled Ridley was "bragging . . . about him and [h]is cousin and this other guy got this guy and for some money and stuff from him," and Ridley mentioned

the name "Euric[] Fountain." White elaborated Ridley bragged "about how they did the guy in . . . for some merchandise."

Ogg testified she was familiar with both Ridley and Fountain, who Ridley said was his cousin. Like White, Ogg remembered that Ridley came to the home she was sharing with White and Daggett around the time of the murder. During this visit, Ridley "was trying to sell a TV set, trying to get money to get out of town," and he told Daggett he had something "real important" to talk to him about. Daggett and Ridley talked in a locked room together for roughly fifteen minutes. After Ridley left, Daggett told Ogg that Ridley "told him about hurting the guy." According to Ogg, Ridley told Daggett "that his cousin Euric[] was with him when it happened." Ogg decided to call the police.

Daggett testified he has known Ridley since they were kids. As to Fountain, Daggett testified: "Know of him. Don't know him." Daggett knew of Fountain through Ridley, who had told him "they was cousins." The day after the murder, according to Daggett, Ridley came to his house, scared and needing to talk to him. They went into White's bedroom, where Ridley shared with Daggett "what he had done." Ridley also shared that "his cousin Euric[]" was involved. Daggett specifically recalled Ridley reported "that night that he was going to this girl's house to see somebody, and the girl wasn't there, and he went to the door, some guy grabbed him, hit his head on the bannister, so he grabbed the brick and hit him on the head." Daggett testified that after Ridley left, he told Ogg what Ridley told him, and she called the police. On cross-examination, Daggett testified that Ridley never specifically mentioned Fountain was involved, as Ridley only stated it was "him and his cousin." On redirect and recross, after being confronted with his

earlier deposition testimony, Daggett testified Ridley did specifically report Fountain was involved.

Detective Larry Harris of the Des Moines Police Department interviewed Ogg and Daggett after Ogg called the police. After those interviews, Harris obtained a search warrant for Ridley's residence. The search of the residence turned up a television and a telephone answering machine, although they didn't seem to be the ones taken from Wilt's residence. After the search, Ridley showed up at the police station on his own. Ridley first denied being involved but then told Harris essentially the same story about the evening that Harris had heard from Daggett. Ridley told Harris two others were with him, "[h]is cousin Euric[]," and someone who goes by the nickname of "Stu or Junior," names that the evidence shows Will Howard went by. Ridley stated Howard was the person who picked up the brick and hit the landlord with it "several times." Ridley reported the trio—being himself, Howard, and Fountain—went to the residence of Fountain's girlfriend, Ethel Sloan, after the incident, and that is where the television was. Police then obtained a search warrant for Sloan's residence. That search did not turn up a television, but police did confiscate two pairs of jeans, a towel, and some shoes.

During a later video-taped interview, Ridley added that both he and Fountain, along with Howard, struck Wilt with a brick multiple times. He also changed his story as to why they went to the residence, stating, "Euric[] came up with a plan to go to this address to rob a dude by the name of Joe."[5] One of the detectives asked Ridley about his shoes, and he reported his "brown leather

---

[5] Joe Gulash lived in another apartment in the building.

shoes" were at Fountain's girlfriend's. Ridley said Fountain had been wearing basketball shoes.

The search warrant that was obtained for Sloan's residence was executed in the early morning hours of October 14. Fountain was present when the warrant was executed, and he led Moon to Ridley's shoes that matched the description provided by Ridley. Officers seized those shoes, which appeared to have been recently washed, and a pair of black and red basketball shoes that were located nearby, which Fountain identified as being his. Fountain was taken into custody. Officers later seized the clothes and black canvas shoes Fountain was wearing when he was arrested. Law enforcement also seized Howard's clothes and shoes after he turned himself into police and was taken into custody

DCI Criminalist Paul Bush testified, among other things, that the brown leather shoes and black and red basketball shoes that were seized had no traces of blood. Bush testified that did not mean they never had blood on them, because the blood could have been washed off. Only Howard's shoes had traces of blood, and those traces matched Wilt's blood type.

DCI Criminalist John Kilgore first compared thirteen shoe impressions found at the scene in blood or dirt to Ridley's size eleven brown leather shoes and Fountain's size nine-and-one-half black and red athletic shoes. One of the impressions made in blood was "consistent in tread design, outsole tread design" with Ridley's shoes. None were consistent with Fountain's athletic shoes. Kilgore also reviewed fifty-one photographs taken at the scene and found twelve of them contained footwear impressions. He used the negatives of those photographs to create a scale impression using the measuring device in the photograph. Eight of

those twelve impressions were consistent with the tread design of Ridley's shoes, but none of them were consistent with Fountain's black and red athletic shoes. Later, Kilgore received the "black canvas shoes" worn by Fountain when he was arrested. Six of the thirteen blood or dirt impressions were "consistent with the tread design" of Fountain's black canvas shoes. One of the blood impressions matched the right of Fountain's black canvas shoes. Kilgore testified this match was more than just consistency—he specifically concluded the exact shoe submitted for comparison made the impression found at the scene. He explained this impression not only matched the "class characteristics" of the shoe, but the "individual characteristics" of the shoe, "cuts, scrapes, and wear patterns," also matched. Kilgore testified the impression made on Wilt's chest was made by Howard's left shoe. When asked whether "any other shoe in the world . . . could have made that print on the victim's chest," Kilgore answered, "no."

Sloan, Fountain's girlfriend, testified Fountain was living with her when the murder occurred. She recalled Fountain and Ridley left the home around 7:00 p.m. on October 9 to go to some clubs, specifically Mickey's Lounge. Fountain returned at 9:30 p.m. alone. About an hour later, Ridley showed up, and he and Fountain went out again. Fountain returned around 2:00 a.m. the next morning by himself. Sloan recalled Fountain had been wearing "black shiny shoes." Sloan knew Fountain and Ridley were good friends, but she didn't know if they were cousins or not. Fountain's sister, Tina, who was at Sloan's house on October 9, testified to a similar timeline. She also testified Fountain was wearing dress shoes.

This brings us to Carr's testimony. She was working as a bartender at Mickey's Lounge on October 9. She testified to knowing Ridley, Fountain, and

Howard "[f]rom coming into the bar." Carr got to work around 6:30 or 7:00 p.m., and saw Ridley, Fountain, and Howard by the pool table. Carr testified the trio stayed for "maybe an hour," left, and then came back together after midnight. After their return, Howard approached her, "he looked scared," and "he told [Carr] what happened." Carr testified Howard "pointed out on his clothes and showed [her] a dark colored stuff that he said was blood," and she recalled observing blood on his shoes and "smeared blood . . . on the palm of his hand." The three left the bar again roughly forty-five minutes after their return. In her testimony, Carr at first thought all of them were wearing tennis shoes the night of the murder. But later in her testimony, she said that she only got a good look at Howard's shoes. At first, she could not identify the black canvas shoes as what Fountain was possibly wearing that night. Right after her testimony concluded, however, the State recalled Carr as a witness because she "remembered something." That "something" was remembering Fountain had on the black canvas shoes that night.

Ridley testified he knew Fountain all of his life and considered him a cousin. Ridley admitted that he was involved in Wilt's murder, as were Howard and Fountain. Ridley testified Fountain came up with the idea "[t]o rob somebody" named Joe at the apartment building that night. He also stated they wore gloves, both because it was cold and so as to not leave any fingerprints. When they entered Wilt's basement apartment, Wilt was present and told them to leave. Ridley declined and tried to pass by, but Wilt grabbed Ridley. Ridley then punched Wilt in the face, and the two scuffled. Eventually, Howard hit Wilt in the head or face with a brick. Ridley testified Fountain also hit Wilt with a brick in the face or chest. Afterward, they took a portable television and returned to Sloan's residence,

then they went back to Mickey's. Ridley could not recall what shoes Fountain and Howard were wearing but thought Fountain's were black. Ridley testified that, on October 11, he went to Daggett's house, told him what had happened, and tried to sell him and White the portable television.

Fountain's mother, Norma, testified the black canvas shoes were not Fountain's, and she saw Ridley wearing them the Sunday after the murder. Fountain's brother, Alonzo Quinn, testified he was with Fountain and Ridley from 8:30 or 9:00 p.m. on October 9 until 2:00 a.m. on October 10. Like Fountain's girlfriend and sister, Alonzo stated Fountain was wearing "[s]hiny shoes." Another witness testified to briefly seeing Alonzo and Fountain together around 2:00 a.m.

On his own behalf, Fountain testified he was at Sloan's on October 9 and Ridley came over shortly after 8:00 p.m. From there, they went to Mickey's, where they stayed until about 10:00 p.m., when Fountain returned to Sloan's by himself. About an hour later, Ridley showed up and asked Fountain to go back to Mickey's with him. They got back to Mickey's around 11:30 p.m. Fountain testified Alonzo got to Mickey's around midnight, and he was with Alonzo and Ridley at various bars the rest of the night until about 2:00 a.m. Fountain testified that he had no part in Wilt's death. He said the black canvas shoes were Ridley's, not his. And he said the only time he ever wore them in his life was when he was arrested. He fingered Carr as a liar as to basically all of her testimony.

### b. Recantation evidence

In her affidavit, Carr stated she did not get to tell her side of the story, allegedly because of police coercion, so she is telling it now. But the only testimony Carr recanted as to Fountain's whereabouts the night in question was that, instead

of seeing all three leave the bar together initially, she saw Ridley and Howard "leave the club together and then later on seen" Howard, Ridley, and Fountain "come back together" and Howard "then left." She did *not* state that Fountain stayed at the bar while Ridley and Howard left. And even with this change in who she saw leave the bar, Carr confirmed her testimony that the three were together that night and that she later saw Fountain return to the bar with Ridley and Howard after she saw the latter two leave. She also stated that she lied about Howard telling her about "any murder," and she never saw anyone's shoes or clothes.

Turning to Daggett, his affidavit also submitted that he was coerced into testifying he knew Fountain. But Daggett never gave any such testimony at trial. He specifically testified he did not know Fountain, and he only knew *of* him through Ridley. The affidavit further provided "William never said the names of other party they told me who was involved with this case. I never said I knew them at all."

### c. Material versus cumulative or impeaching

Beginning with Carr's affidavit, we conclude it is not material on the issue of Fountain's whereabouts throughout the night. The only thing Carr changed on that issue is that she did not see Fountain leave with the others. But she confirmed the three were together at the bar and that, "later on," she did see Fountain return with them. If he returned with them, chances are he was elsewhere with them, which tracks Carr's trial testimony that they left the bar together.

As to Carr's retaking of the stand to testify about Fountain wearing the black canvas shoes that evening, we conclude the recantation was merely cumulative and impeaching. As the district court pointed out, Carr went back and forth on whether she saw Fountain's shoes or not and, if she did, what they were. She first

stated he was wearing tennis shoes.  Later, she stated that she did not get a good enough look at them to identify what they were, because "[t]he bar is kind of dark in there at night."  When she was physically shown the black canvas shoes, she classified those as tennis shoes but did not remember anyone wearing those shoes that night.  Recalled as a witness minutes later, she testified Fountain was wearing "them black tennis shoes" or "shoes like that" the night of the murder.  Given Carr's back-and-forth on the shoe identification, adding her recantation about seeing the shoes would just be further impeachment evidence and cumulative on whether she could identify what shoes Fountain was wearing or not.

Turning to Daggett, his affidavit first said that he was coerced into saying he knew Fountain.  But at the criminal trial, Daggett expressly testified that he did not know Fountain, so this point of his affidavit is not material.  The affidavit further provided, "William never said the names of other party they told me who was involved with this case.  I never said I knew them at all."  Similar to Carr's t.estimony, Daggett went back-and-forth in his testimony on whether Ridley told him Fountain was involved with the murder.  As a result, we find this recantation is simply additional impeachment evidence that is cumulative of Daggett's indecisiveness on whether Ridley informed him Fountain was involved.

### d.        Whether the result would probably be different

Having found the recantation lacks materiality, we likewise conclude it probably wouldn't have changed the outcome.  As to Daggett, extricating his trial testimony on whether Ridley advised him Fountain was involved would still leave that same evidence in the record through Ogg's testimony about what Daggett told her.  *See State v. Compiano*, 154 N.W.2d 845, 850 (Iowa 1967) ("Mere recantation

of a witness on any material matter should not necessitate a new trial if, eliminating such evidence, there is still substantial evidence to support the jury's verdict."); *accord Moon*, 911 N.W.2d at 153.

Turning to Carr, Fountain essentially argues her affidavit negates any corroboration for Ridley's version of the events and "undermines the only evidence the State used to tie Fountain to the crime—the shoes." As to the timeline, again, Carr only changed that she saw Fountain leave with the other culprits, yet she confirmed they were together and the three of them returned together later on. This does not overcome the State's theory of the timeline in favor of Fountain's questionable alibi defense. And Fountain fails to mention one large piece of the puzzle on the shoes—he was wearing the exact pair of shoes tied to the crime scene when he was arrested mere days later. While he and others tried to say those shoes belong to Ridley, another pair of shoes that Ridley admitted he was wearing when he participated in the crime also had forensic ties to the scene. Notably, Ridley wore a size eleven and Fountain wore a size nine-and-a-half.

Even without Daggett and Carr's corroborating testimony, there was ample other corroborating evidence connecting Fountain to the murder that is not undermined by the recantation evidence. *See Wright v. State*, No. 15-1530, 2017 WL 936077, at *8 (Iowa Ct. App. Mar. 8, 2017) (rejecting newly-discovered-evidence claim because "the corroborating evidence was not affected by [the witness's] alleged recantation"). All-in-all, we conclude the new evidence is insufficient to reach a finding that it probably would have changed the result of the criminal trial.

**III.     Conclusion**

We affirm the entry of summary disposition and conclude, based on the undisputed facts, that Fountain cannot show the recantation evidence is material and probably would have changed the outcome of the criminal trial as required for a newly-discovered-evidence claim under Iowa Code section 822.2(1)(d).

**AFFIRMED.**