# IN THE COURT OF APPEALS OF IOWA

No. 22-0961
Filed September 13, 2023


**JEROME POWER,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____


    Appeal from the Iowa District Court for Linn County, Paul D. Miller, Judge.


    Jerome Power appeals the denial of his application for postconviction relief.

**AFFIRMED.**


    Kent A. Simmons, Bettendorf, for appellant.

    Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney

General, for appellee State.


    Considered by Ahlers, P.J., Badding, J., and Danilson, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**DANILSON, Senior Judge.**

Jerome Power appeals the denial of his application for postconviction relief (PCR) following his conviction for first-degree murder. Power contends his trial counsel was ineffective in failing to "investigate and present a defense based on the medical condition of his right hand," and PCR counsel was ineffective in failing to advance his claim against trial counsel. Upon our review, we affirm.

## I.    *Background Facts and Proceedings*

In 2012, a jury found Power guilty of first-degree murder. This court previously set forth the following facts surrounding the incident leading to Power's charge as follows:

> On September 19, 2010, just after the ten o'clock news, sixty-eight-year-old Doris Bevins called her friend, Phillip Bemer, to discuss the next day's weather. While on the phone Phillip heard someone beating on Doris's door. He advised her against answering it. She told Phillip she "wasn't scared of nobody" and wanted to know "who in the hell was at her door at this time of night." When Doris answered the door, a man asked her if she had a gas or an electric stove. Doris first responded: "[I]t's a gas stove." Then Phillip heard her say: "What do you want?" and "Get the hell out of here." Doris next screamed: "Help. Oh, Lord help me." After that, Phillip heard a gurgling noise and a loud thud, which gave him "cold chills on the other end of the phone."
> Phillip called 911, and the police arrived at Doris's apartment a few minutes later. When the officers arrived, they announced their presence before they were forced to break down the apartment door. When they entered, the officers found Doris on the floor with her nightgown pulled over her head and a pair of pajama bottoms tied tightly around her neck. Emergency responders tried to resuscitate her but with no luck. They took Doris to the hospital where she died two days later. The medical examiner determined the cause of death to be ligature strangulation.
> Soon after discovering Doris police saw Jerome Power standing in the doorway of Doris's kitchen. Power and his girlfriend, Mary Meier, lived in the apartment upstairs from Doris. Officers placed Power under arrest at gunpoint. When they searched Power, police found a cigarette lighter, a stocking cap, a red LED light, a cell phone, and a charger. Power told officers at least three times he

wanted them to give his keys and the cell phone to Meier. The phone was later identified as belonging to Doris.

As police were taking Power to their squad car, he started yelling that he had seen a black male running out of Doris's apartment. During an interview at the station, Power told detectives he saw Terry Wilson, a white man, exit the apartment. Power also told them he called 911 from Doris's apartment and gave her CPR but later admitted those statements were not true.

Power later sent a letter to investigators, dated July 13, 2011, casting aspersions on a black male whom Power allegedly saw on the night in question. In his trial testimony, Power told the jury he went to Doris's apartment because she asked him to inflate an air mattress for her. He said he locked Doris's front door "just out of force of habit." He testified he walked to the back of the apartment to look for the air pump and did not see Doris on the floor until after he heard the police pounding on the door. He said he was going to the door when the police knocked it down.

*State v. Power*, No. 13-0052, 2014 WL 2600214, at *1 (Iowa Ct. App. June 11, 2014).

The court affirmed Power's conviction on direct appeal, rejecting his challenges to the sufficiency of the evidence, the trial court's instructing the jury with an *Allen* charge,[1] and the trial court's denial of Power's request for substitute counsel. The court preserved Power's ineffective-assistance-of-counsel claim relating to counsel's failure to "pursu[e] the theory that his hand injury left him unable to strangle the victim" for possible PCR proceedings. *See id.* at *3.

Power filed a PCR application again raising that claim.[2] Following trial, the PCR court denied the application. Power appealed.

---

[1] "The common name for verdict-urging or 'dynamite' instructions comes from *Allen v. United States*, 164 U.S. 492, 501 (1896)." *See Power*, 2014 WL 2600214, at *1 n.1.

[2] Power also raised additional claims of ineffective assistance of counsel, which were rejected by the PCR court. But he does not challenge those findings on appeal.

## II. Standard of Review

"We generally review a district court's denial of an application for postconviction relief for errors at law." *Doss v. State*, 961 N.W.2d 701, 709 (Iowa 2021). However, our review is de novo "[w]hen the basis for relief implicates a violation of a constitutional dimension," including claims of ineffective assistance of counsel. *Id.* (alteration in original) (quoting *Moon v. State*, 911 N.W.2d 137, 142 (Iowa 2018)); *see Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021).

## III. Discussion

To prevail on a claim of ineffective assistance of counsel, Power must show (1) counsel breached an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "We may affirm the district court's rejection of an ineffective-assistance-of-counsel claim if either element is lacking." *Anfinson v. State*, 758 N.W.2d 496, 499 (Iowa 2008).

On appeal, Power challenges the PCR court's denial of his claim that trial counsel was ineffective in failing to present evidence showing it was physically impossible for him to have committed the crime and PCR counsel was ineffective in failing to advance his claim of trial counsel's ineffectiveness. Specifically, he contends: "[P]ostconviction trial counsel failed to effectively prepare, litigate, and argue the claim that [he] could not have tied the knot used to inflict ligature strangulation and failed to call an expert witness who could have provided material testimony to demonstrate the ineffective assistance of counsel in the criminal trial." The following facts are relevant to this claim.

At Power's criminal trial, his girlfriend testified that "in the last five or six years," Power was hospitalized for "an infection in his knuckle and it went up his

arm." As a result of the infection, "[h]e couldn't make a fist." Power also testified about his infection, stating it "fused bones together, the joints together" resulting in "permanent damage" to his hand. He demonstrated the function of his hand for the jury, stating, "I can't bend this finger. I can't bend this finger. Sometimes my thumb, it locks up. See, I have to unlock it."

At the scene of the crime, police discovered Doris lying on the floor with "a pair of pajama pants which were tied tightly around her neck." Officer Sarah Lacina testified, "I reached out to untie them" and "[i]t was tied tightly enough that I had to kind of get a good grip and dig my fingers in to release the tie of the pajama pants and then check for a pulse."

On appeal, Power contends, "It was highly unlikely [he] could have so tightly tied that knot in the way Officer Lacina found it" due to his lack of hand function. Power claims his trial and PCR counsel were ineffective in failing to investigate and present a defense based on the medical condition of his right hand.[3] He acknowledges counsel "did get his medical records" but states "they did not obtain an expert for him." According to Power, "So basically what it came down to, [trial counsel] Steve Addington and Jason Dunn only obtained the medical records, but

---

[3] Power acknowledged his girlfriend testified that he could not make a fist. He also testified as follows:

> Q. And did you mention your injury and not being able to make a fist to the jury? A. To my recollection, I believe I did. I even showed the jury my whole hand, my hand, the injuries.
> Q. When you testified do you remember saying anything to the effect of there's no way I could have done this, anything like that? A. That's correct.

they would not call the doctors that I requested that treated me." Power believed "a medical opinion would have actually weighed a lot."

Dunn testified he and Power discussed Power's hand condition "at length," but "it wasn't anything that we could hang our hat on." Dunn explained:

> So Jerome had brought this to our attention early on and indicated, you know, it was physically impossible for him to strangle this victim. We did do a deposition of the state medical examiner, Dr. Thompson. And I believe during that deposition I posed the question to him, you know, how much pressure or strength—I forget exactly how I put it—would it take, you know, to—you know, to basically cut someone's air off in a manner such as Doris was believed to have been killed. And that was, I think, pajama bottoms around her neck and being strangled to death. And the medical examiner, I believe his testimony was it was like ten pounds or less, so not very much.
>
> And, again, it wasn't ever a serious—to me it was never a serious point of contention or really something that we would want to pursue because of just the—again, it wouldn't take very much pressure, and you could do it with your off hand. And Jerome had told the police at some point that he had tried to provide CPR to Ms. Bevins as part of his testimony I think either when he was arrested or at trial, trying to help her.
>
> So this whole idea that he wasn't physically capable of doing this was—I mean, did not comport with the facts that—or just what it would take to actually get that done. And despite his—you know, it was something he repeated. I don't want to minimize that at all. But it was just never a—it was never a strategy that I thought was wise or something that would ever gain any—there's more pitfalls to that idea than there was any benefit that we might get, again, because it doesn't take hardly any pressure at all to strangle someone, apparently . . . .

Dunn then reiterated, "[I]t was certainly something that I would want to stay away from because, again, ten pounds isn't very much. It wasn't a fact that I was interested in highlighting at all," where "the proper response would be, well, you could use your other hand." In short, Dunn stated "it was never a serious theory for us to pursue" because "I don't think we could have even, had we tried, gotten

any medical expert to come in and say what Mr. Power wanted him to say just from the mere fact, I guess, less than ten pounds is all it takes to strangle someone out."

In ruling on Power's claim, the PCR court found:

At his jury trial, both Power and his girlfriend testified that Power's hand injury (difficulty bending two fingers on his right hand) would prevent him from strangling someone. The jury obviously found this testimony unconvincing. Power argues that trial counsel should have offered medical testimony to support this contention. At this hearing, the Court admitted Power's medical records (Petitioner's Exhibit 1) and x-ray scans of his hand (Petitioner's Exhibit 3). The medical records show limited motion in his PIP joint, mild coronal plane abnormality, passive flexion limited to sixty-five degrees and flexion to fifty degrees. Power contends that a doctor could have given opinion testimony confirming his claim. However, at the post-conviction trial, Power did not present expert testimony confirming that his hand injury would have prevented or impeded his ability to strangle someone.

. . . .

It is undisputed that Power had finger injuries. He testified to them in detail at trial and this hearing. At this PCR hearing, he presented no expert medical testimony to support his assertion that his injury physically precluded him from strangling another. I also note that at the underlying criminal trial, the state medical examiner, Dr. John Thompson, testified that the cause of death was ligature strangulation and that "it doesn't actually take that much force to occlude the blood vessels in the neck" (to strangle someone) (Respondent's Exhibit B, pgs. 13-14). At this hearing, trial counsel testified that he discussed with Power his finger injury at length and didn't feel the injuries were severe enough to preclude use of his hand. Based on the medical examiner's testimony that it did not take much force to occlude the blood vessels in the neck and strangle someone, trial counsel made a strategic decision to not present medical testimony. Trial counsel also felt this potential medical evidence was inconsistent with Power's claim (and trial testimony) that he was trying to help the victim by administering CPR. Finally, trial counsel testified that "We vetted that concern of Mr. Power (the use of medical testimony) pretty thoroughly and made sufficient record, I believe, regarding our decision not to go that route. And I believe that decision is sound today."

. . . .

Under the record before me and considering the medical examiner's testimony, the fact that Power did not present medical testimony at this hearing and trial counsel's strategic decision, I FIND that Power has failed to meet his burden of proof and establish that

he was prejudiced by trial counsel's alleged breach. In the alternative, I FIND that Power has failed to meet his burden of proof and establish that trial counsel violated an essential duty.

We concur in the court's assessment. Under these facts and circumstances, even with a medical expert the result of the trial would not have changed. Nor would a different result have been reached if the expert was presented at the PCR hearing. In sum, there is no probability of a different result had trial or PCR counsel attempted to further Power's hand-function claim with expert testimony. As this court previously observed, "The State's evidence did not leave much room for the jury to wonder 'whodunit.'" Power was in Doris's apartment when police arrived, the door was locked, and he did not respond to the police at the door nor was he observed lending any aid to Doris. Power also had Doris's cell phone in his pocket and asked police to give the phone to his girlfriend, Doris's friend overheard much of the attack on the phone, Power lied to police about calling 911, and Power's claim that a person by the name of Terry Wilson was to blame proved false. Power's claimed inability to tie a knot does not overcome the overwhelming evidence of his guilt. We affirm the court's denial of Power's PCR application and conclude Power has failed to prove he was prejudiced by PCR counsel's failure to present testimony of a medical expert.

**AFFIRMED.**